MIAMI TRIBE OF OKLAHOMA, also known as the Miami Tribe, et al. and Ira Sylvester Godfroy, et al.

v.

UNITED STATES.

No. 2–58.

United States Court of Claims.
July 13, 1959.

Edward P. Morse, Chicago, Ill., for appellants and cross-appellees Miami Tribe of Oklahoma and others. Edwin A. Rothschild, Chicago, Ill., and Louis L. Rochmes, Washington, D. C., were on the briefs.

Walter H. Maloney and James N. Beery, Washington, D. C., filed a brief on behalf of appellants and cross-appellees Ira Sylvester Godfroy and others.

Ralph A. Barney and W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for the United States as cross-appellant and appellee.

MADDEN, Judge.

The Indian claimants and the United States have filed cross appeals from a final determination rendered by the Indian Claims Commission in their Docket

Nos. 67 and 124. This determination was made in three stages. In its first decision, 2 Ind.Cl.Comm. 617, 645 (March 26, 1954), the Commission held that the Miami Tribe had so-called "recognized" title to 4,291,500 acres of land located in the State of Indiana and ceded to the United States under the Treaty of October 6, 1818, 7 Stat. 189, and that because of such recognition the claimant Indians did not have to prove their exclusive use and occupancy of the land ceded.[1] The Government, defendant below, has appealed from this holding. In its second decision, 4 Ind.Cl.Comm. 346, 408 (September 17, 1956), the Commission found that as of the date the land was ceded to the United States it had a fair market value of 75¢ per acre and the Commission held that because the difference between that value and the purchase price of 6.4¢ per acre paid for the land was an unconscionable discrepancy within the meaning of section 2(3) of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70a(3), the Indian claimants were entitled to a judgment for the difference. The Government has appealed from this decision on the ground that the ultimate finding of 75¢ per acre market value for the land in 1818 is not supported by the primary findings made by the Commission, that

1. On the issue of title there was consolidated for hearing by the Commission Docket Nos. 67 and 124 (Miamis), Docket No. 314 (The Peoria Tribe of Oklahoma et al. on behalf of the Wea Nation), and Docket No. 337 (Absentee Delaware Tribe of Oklahoma, Delaware Nation et al.). The following tribes intervened and presented their claims: Pottawatomie (Docket No. 15–D); Citizen Band of Pottawatomie (Docket No. 311); Kickapoo Tribe of Kansas (Docket No. 315); The Six Nations et al. (Docket No. 89); Hannahville Indian Community (Docket No. 29–B). The Commission held that none of the intervenors had established an interest in the area ceded and their petitions of intervention were dismissed. No appeal has been taken from this dismissal. The Commission held that the Miamis (Docket Nos. 67 and 124) had established title to 4,291,500 acres of the land ceded; that the Weas had established their own-

ership of 815,000 acres of the area, and that the Delawares had established that they had a one half interest with the Miamis in 3,859,000 acres, amounting to 1,929,500. The Miamis, Weas and Delawares agreed that the value of the land (represented on Royce's Map of Indiana as tract 99) should be valued as of the date of the Miami Treaty of October 6, 1818 (the other two tribes having ceded their lands on October 2 and October 3, 1818) and that the Commission's determination of value in the Miami case would be binding upon the Weas and Delawares in Docket Nos. 314 and 337. Because of certain issues present in Docket Nos. 314 and 337 which were not ripe for consideration by the Commission, no award could be made for the Weas or Delawares. Accordingly, the instant appeal involves only the Miami Indians in Docket Nos. 67 and 124 in which cases final determinations have been made.

some of the primary findings are not supported by substantial evidence, and that on the basis of the record as a whole the Commission could not reasonably have reached a fair market value of more than 20¢ per acre. The Indian claimants have also appealed from this decision on value on the same ground that the ultimate finding of 75¢ per acre market value in 1818 is not supported by any of the primary findings of the Commission, but except for certain findings which the Indian claimants urge are not properly findings at all, the Indian claimants do not attack the correctness of the primary findings but contend that they lead irresistibly to an ultimate finding of market value of the land in an amount in excess of 75¢ per acre. In its third decision relating to offsets, 5 Ind.Cl.Comm. 494, 516 (September 30, 1957) the Commission allowed $280,500 as a "payment on the claim" and the Government has appealed from this decision on the ground that as a matter of law it is entitled to certain additional deductions.

We first turn to the question of whether the Indian Claims Commission erred as a matter of law in holding that the claimant Indians' title to the land ceded to the United States under the 1818 Treaty had been recognized and acknowledged by the United States so that the claimant Indians were not required to prove their exclusive aboriginal use and occupancy of the area from time immemorial down to the time of the 1818 cession.

We shall review the facts on which the Commission based its conclusion that the United States had, prior to the Treaty of 1818, recognized in the claimant Indians their right of permanent use and enjoyment of the land ceded by the Treaty in 1818. Following the conclusion of the Revolutionary War, much of the territory ceded to the United States by Great Britain east of the Mississippi River was occupied by Indian tribes, many of whom were hostile to the United States and far from at peace with each other. It was the desire of the new Government to conciliate these hostile tribes and to bring about a state of peace between the tribes themselves. To both the Indians and the white inhabitants of the United States land was a matter of paramount importance and the settlement of disputes concerning conflicting claims thereto was a continuing concern of Congress. In order to bring about a more tranquil state of affairs between the Indians themselves and between the Indians and the white inhabitants of the United States, the Government negotiated numerous treaties of peace and friendship for the establishment of boundaries between the areas of land occupied and used by the tribes and those areas of land claimed and used by the United States, as well as the establishment of boundaries between the lands claimed and used by the various tribes themselves.

On July 13, 1787, Congress enacted an Ordinance for the Government of the Territories of the United States northwest of the Ohio River known as the Northwest Ordinance. On August 7, 1789, this ordinance was reenacted to adapt its provisions to the Constitution of the United States, 1 Stat. 50. The ordinance printed in the margin of 1 Stat. pp. 50–53 provided for the government of a territory which later became the states of Ohio, Indiana, Illinois and Michigan. In Article III it was provided:

"Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. The utmost good faith shall always be observed towards the Indians; their land and property shall never be taken from them without their consent; and in their property, rights and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs

930

being done to them, and for preserving peace and friendship with them."

In 1794, in pursuance of the policy expressed in the above quoted provision of the Northwest Ordinance, General Anthony Wayne was appointed a commissioner to negotiate a treaty with the hostile tribes of the Northwest Territory. In his treaty instructions it was emphasized that he should attempt to bring about an agreement concerning a dividing boundary line between lands used and occupied by the Indian tribes in the territory and the lands which belonged to the United States. He was also instructed to establish the boundry lines between the lands owned by the separate tribes in the territory. He was authorized to guarantee to the Indian tribes the right to the soil in the lands owned by them as against any citizens or inhabitant of the United States. During the course of the negotiations with the Wyandots, Delawares, Shawnees, Ottawas, Chippewas, Pottawatamies, Miamis, Eel River, Weas, Kickapoos, Piankishaws and the Kaskakias, it became apparent that it would not at that time be possible to persuade the tribes to agree to definite boundaries between their separate areas of occupation and accordingly his treaty instructions were altered to permit him to make a single treaty with all of the tribes establishing the overall boundaries of the land owned by all of them without defining inter-tribal boundaries. The treaty was negotiated at Greenville and executed on August 3, 1795. 7 Stat. 49. The purposes of the treaty were declared to be to put an end to destructive warfare, to settle all controversies between the treaty parties, and to restore free intercourse between the Indian tribes and the United States. In Article III of the Treaty of Greenville a general boundary line between the lands agreed to be owned by the United States and the lands agreed to be owned by the Indians was described. This line, known as the Greenville Line of 1795, began at the mouth of the Cayahoga River on Lake Erie at a point in the western part of Ohio where Cleveland is now located. From the mouth of the river the line ran south about 70 miles to Fort Lawrence, Ohio, thence west across the center part of the state to the border of what later became the state of Indiana at Fort Recovery on a branch of the Wabash River. The line then went southwest at a slight angle to the Ohio River on the border between Indiana and Kentucky to a point on that border about 25 miles west of the Ohio state line. In that same article of the treaty the Indian tribes, in consideration of the peace established, of goods already received and to be received thereafter from the United States, and to indemnify the United States for injuries and expenses sustained during their war, ceded and relinquished all of their claims to the land lying to the east and to the south of that line. This cession is identified on Royce's map of Indiana and Ohio as Area 11 and the cession included about two-thirds of the state of Ohio south of the line, and a little less than one-third of the eastern part of that state, plus a narrow triangle of land in eastern Indiana. In addition to this large cession, the tribes ceded to the United States some 16 small tracts of land in Ohio and Indiana which were occupied by various Government installations, and the Indians agreed to allow the people of the United States free passage by land and water through the Indian country lying along the chain of posts included in the 16 small cessions, and the free use of harbors and the mouths of rivers along the lakes adjoining the Indian territories for the shelter of vessels and the landing of cargoes.

In Article IV of the Treaty of Greenville, the United States agreed to relinquish to the Indian signatories to the treaty Indian lands lying north of the Ohio River, east of the Mississippi River, and west and south of the Great Lakes and the waters uniting them, according to the boundary line agreed on by the United States and Great Britain in the Treaty of 1783, 8 Stat. 80, reserving to the United States four tracts of land in-

cluding one located at the post of Fort Vincennes on the Wabash River in southwestern Indiana. This "relinquishment" on the part of the United States was stated to be made in consideration of the peace established and of the cessions and relinquishments of lands made by the Indians in Article III and was intended to indicate the liberality of the United States and to represent "the great means of rendering this peace strong and perpetual." In return for the cessions made by the Indians to the United States, the United States agreed to deliver to the Indians certain annual allowances in varying amounts.

In Article V of the Treaty of Greenville it was declared precisely what was intended to be the meaning of the "relinquishment" made to the Indians by the United States of the land in Article IV of the treaty. Article V of the Treaty of Greenville provides as follows:

"To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is thus: The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same. And the said Indian tribes again acknowledge themselves to be under the protection of the said United States and no other power whatever."

In Article VI of the treaty it was provided that any citizen or inhabitant of the United States who might settle upon the lands relinquished by the United States to the Indians would be out of the protection of the United States and the particular tribe on whose land such a settlement might be made could drive the settler off or punish him in any manner the tribe thought fit. The article also provided that because such settlements would be injurious to the Indians and to the United States, the United States would be at liberty to break such settlements up, to remove and punish the settlers and thus protect the Indian lands guaranteed in the previous articles.

In Article VII of the treaty the Indians were given the right to hunt within the land which they had ceded to the United States, as long as they behaved properly.

In Article VIII it was provided that trade would be opened with the Indian tribes and that the tribes would afford protection to properly licensed traders.

Article IX provided for an orderly settlement by the Indian superintendent of any disputes that might arise. It also provided that if a tribe planned to make war against the United States, any tribe learning of such intention should immediately give notice to the commanding officer of the troops of the United States at the nearest post. In return, the United States agreed to give notice to the Indians of any harm which it learned might be planned against the tribes.

Although the Treaty of Greenville did not establish boundaries between the lands of the various signatory tribes, the tribal representatives to the treaty understood that the United States was dealing with each tribe independently of the others and that boundaries would be established as between the various tribes by future negotiations. The work of defining these boundaries preparatory to seeking further cessions of the lands declared to belong to the Greenville Treaty Indians was entrusted to William Henry Harrison who became Governor of the Indiana Territory and Superintendent of Indian Affairs. After making a thorough study of the problem of inter-tribal boundaries, Governor Harrison commenced his project by negotiating a

treaty with the Greenville Treaty Indian tribes on June 7, 1803, 7 Stat. 74. In Article I of that treaty it was noted that the boundaries of the tract of land located at Fort Vincennes in southwestern Indiana, which the United States had reserved for its use in Article IV of the Treaty of Greenville, had been difficult to determine but that the boundaries had now been agreed upon. This area of land known as the Vincennes Tract is Area 26 on Royce's map of Indiana.

On August 18, 1804, Governor Harrison negotiated a treaty with the Delaware Tribe of Indians, 7 Stat. 81. In Article 1 of that treaty, the Delaware tribe ceded to the United States all their right and title to a tract of country bounded on the south by the Ohio River, on the west by the Wabash River, on the north by the tract ceded by the Treaty of Greenville (1795) and redefined by the Treaty of Fort Wayne (1803) (the Vincennes Tract) and the road leading from Vincennes to the Falls of Ohio. In Article 4 of this treaty it was stated that the Delaware tribe had exhibited to Governor Harrison sufficient proof of its right to all the country lying between the Ohio River and the White River [2] and that the Miami tribe, who were the original owners of the upper part of that country, had explicitly acknowledged the title of the Delawares at a tribal council held at Fort Wayne in June 1803. The United States then agreed that it would in the future consider the Delaware tribe as the rightful owners of all the country bounded by the White River on the north, the Ohio on the south, the general boundary line running from the mouth of the Kentucky River on the east (the Greenville Line) and one of the northern boundaries of the tract ceded in Article 1 of the treaty and that ceded by the Treaty of Greenville (the Vincennes Tract) on the west and the southwest. This article of the treaty thus identified a tract of land in southern Indiana as

being the sole property of the Delawares.

In Article 5 of the Treaty of August 18, 1804, it was stipulated that the United States would negotiate with the Piankishaw tribe to secure its acknowledgment of the title of the Delawares to the tract of country ceded in Article 1 of the treaty. On August 27, 1804, the Piankishaws agreed (7 Stat. 83) to the cession of the Vincennes Tract covered by the Treaty of Greenville, and to the cession of land south of that tract by the Delawares in Article 1 of the Treaty of August 18, 1804. The Delaware cession of land to the south and east of the Vincennes Tract is Area 49 on Royce's map of Indiana.

On August 26, 1805, Governor Harrison wrote to the Secretary of War stating that the Miami Tribe of Indians would not agree to recognize the Delaware claims set forth in Article 4 of the 1804 Treaty with the Delawares to the country between the White River and the Ohio River east of the Vincennes Tract. Governor Harrison stated that he was finally persuaded that the Miamis had not intended in the 1803 Council at Fort Wayne to concede or recognize any right or title in the Delaware Tribe to that tract and so he proposed to take a cession of the disputed area from the Miamis. In the same letter, Governor Harrison stated that the Pottawatomies had finally given up any right to interfere in future sales of land which might be made by the Miamis on the Wabash River and its waters, stating "The guarantee of those lands to the three tribes, who call themselves Miamis, could not be avoided, as they insisted upon it with the most persevering obstinacy but, I conceive that it will be no difficult matter to get them, in the course of a few years, to make a division of the land they now hold in common. At any rate, a point of much consequence has been gained, by getting the other tribes to acknowledge

2. The Ohio River forms the southern boundary of Indiana and the White River beginning at the Illinois border runs eastward through south central Indiana through the Vincennes Tract to the border of Ohio.

their [Miamis'] exclusive title to the country of the Wabash, above the Vincennes Tract." Governor Harrison was discussing his negotiations in connection with the Treaty of Grouseland (near Vincennes, Indiana) executed August 21, 1805, 7 Stat. 91. This treaty was between the United States and the Miamis, Delawares, Pottawatomies, Eel River, and Weas. In Article I of that treaty it was stated that whereas by the fourth article of the 1804 treaty with the Delawares the United States had agreed to consider the Delawares as the owners of the land bounded by the White River on the north, the Ohio on the south, the Greenville Line on the east and the Vincennes Tract on the west, and whereas the Miami Tribe from whom the Delawares derived their claim insisted that they had never intended to convey to the Delawares more than a right to occupy that land temporarily, the Delawares, for the sake of peace, had decided to relinquish their claim to that tract and to release the United States from the guarantee made in Article 4 of the 1804 treaty. In Article II of the Treaty of Grouseland the Miamis, Eel River and Wea tribes ceded to the United States the tract of land described in Article I identified on Royce's map of Indiana as Area 56, and in Article III, in consideration of such cession, the United States undertook to give the three tribes additional permanent annuities of $600 to the Miamis, $250 each to the Eel River and the Weas.

In Article IV of the Treaty of Grouseland it was stated that since the Miamis, Eel River and Weas considered themselves to be one nation and were agreed that none of them would dispose of any part of the country held in common, the United States agreed to consider them as owners "of all the country on the Wabash and its waters, above the Vincennes Tract,[3] and which has not been ceded to the United States, by this or any former treaty; and they do farther engage that they will not purchase any part of the said country without the consent of each of the said tribes." Article IV contained a proviso that nothing in the treaty would be taken to weaken any claim which the Kickapoos might have to the country which they occupied on the Vermillion River (northwestern Indiana). In Article V the Pottawatamies, Miami, Eel River, and Wea tribes acknowledged the right of the Delawares to sell the tract of land already conveyed to the United States in Article I of the 1804 treaty (Royce Area 49 in Indiana).

On September 30, 1809, Governor Harrison negotiated a treaty with the Delawares, Pottawatamies, Miamis, and Eel River Miamis at Fort Wayne, Indiana, 7 Stat. 113. In Article 1 of this treaty the four tribes ceded to the United States a tract of land lying just north of the Vincennes tract in western Indiana and indicated on Royce's map of Indiana as Area 71. In the same article these tribes also ceded a narrow strip of land on the eastern edge of Indiana bounded on the east by the Greenville Treaty Line and on the south by the Grouseland Line (Royce's Area 56). In the second article of the treaty the Miamis acknowledged the equal right of the Delawares with themselves "to the country watered by the White River" and it was stipulated that neither party could dispose of the same without the consent of the other. In Article IV of the treaty it was stated that all the stipulations made in the Treaty of Greenville of 1795 respecting the manner of paying annuities and the right of the Indians to hunt upon the lands should apply to the annuities

---

3. The extent of the area intended to be included in this provision identifying land owned by the Miamis, is somewhat clarified by a report of Governor Harrison to the Secretary of War on March 22, 1814, in which he stated of the lands watered by the Wabash that they were the lands "which were declared to be the property to the Miames, *with the excep-* *tion of the tract occupied by the Delawares on the White River*, which was to be considered as the joint property of them and the Miames." From the correspondence and documents in the record it appears that the White River was at that time considered to be one of the "waters of the Wabash." [Italics supplied.]

934

granted and the lands ceded in the Treaty of Fort Wayne. In Article 5 it was noted that the consent of the Wea tribe would be necessary to complete the title to the first tract ceded in western Indiana (Royce Area 71) and that a separate treaty would therefore be entered into between the Weas and the United States. In Article 9 of the Treaty of Fort Wayne the signatory tribes agreed to cede to the United States an area of land on the northwest side of the Wabash above the Vincennes Tract in the vicinity of Raccoon Creek if the Kickapoos should agree to such a cession (Royce's Area 73 in Indiana).

By the Treaty of October 26, 1809, 7 Stat. 116, the Weas gave their consent to the Treaty of September 30, 1809, in connection with Royce's Area 71 ceded in Article 1 of the latter treaty. In the Treaty of December 9, 1809, with the Kickapoos, 7 Stat. 117, that tribe gave its consent to the cession of Royce's Area 73 in then ninth article of the Treaty of September 30, 1809, and also agreed to cede to the United States an additional tract lying just above Area 73 and identified as Area 74 on Royce's map of Indiana.

In the Treaty of June 4, 1816, at Fort Harrison, Indiana, 7 Stat. 145, the Weas and Kickapoos recognized and confirmed the Treaty of Greenville of 1795 and all subsequent treaties made by them. In Article 3 they confirmed the boundary line surveyed and marked by the United States of the two tracts of land on the Wabash and the White Rivers ceded in Article 1 of the Treaty of Fort Wayne on September 30, 1809 (Royce's map of Indiana Areas 71 and 72). The Kickapoos acknowledged that by the terms of the Treaty of December 9, 1809, they had ceded to the United States the tract identified as Area 74 on Royce's map of Indiana.

In the Treaty of September 29, 1817, 7 Stat. 160, the Wyandots, Senacas, Delawares, Shawnees, Pottawatomies, Ottawas, and Chippewas ceded a tract of land in Ohio (Royce's Area 87 on the map of Ohio) which included a small triangle of land between the Miami and the St. Mary's Rivers in northeastern Indiana (identified as Area 87 on Royce's map of Indiana).

By the Treaty of October 2, 1818, at St. Mary's, Ohio, 7 Stat. 185, the Pottawatomies ceded a tract of land in northwestern Indiana on the western and north banks of the Wabash River identified on Royce's map of Indiana as Area 98. In another treaty on October 2, 1818, at St. Mary's, Ohio, with the Wea tribe, 7 Stat. 186, the Weas ceded to the United States all the lands claimed and owned by them in the states of Indiana, Ohio and Illinois and reserved to themselves a tract of land which was later found to be within the cession made on October 6, 1818, by the Miamis (Royce's map of Indiana Area 114). In a treaty of October 3, 1818, with the Delawares, 7 Stat. 188, the Delawares ceded all their claims to land in the state of Indiana, and the United States agreed to provide the Delawares with land west of the Mississippi River.

In the spring of 1818 three commissioners were appointed to negotiate treaties with the Miamis and other Indian tribes in Indiana for the cession of the lands watered by the Wabash and the White Rivers. In the letter of May 2, 1818, from the Secretary of War to the treaty commissioners it was stated that because that part of Indiana to which Indian title had already been extinguished was of an "inconvenient form" it was the object of the prospective treaty negotiations to acquire from the tribes such additional cessions "as, being added to the present, will render it more convenient and compact." In a letter to the Secretary of War, dated June 19, 1818, from Governor Cass, one of the treaty commissioners, he stated that because the country owned by the Miamis in Indiana and desired by the Government was "probably equal to any in the world," he recommended that powerful inducements would be necessary to persuade the Miamis to make the cession and that the inducements should be "visible and immediate" rather than "prospective and con-

tingent." Neither the War Department records nor the records of the Indian Office contain the journal of the proceedings of the commissioners with the Miamis in connection with the negotiation of the 1818 Treaty but the War Department records do contain the report dated October 28, 1818, made by Governor Jennings, one of the treaty commissioners, to the Secretary of War, relative to the treaties executed in October of 1818 with the Miamis and the other Indians in Indiana. In the treaty instructions the commissioners had been told that they might, if absolutely necessary, grant reservations for the use of the tribe and make individual grants to influential chiefs and half breeds but with the qualification, in connection with the latter grants, that they could be disposed of only with the consent of the President. It was the desire of the Government even at that early date to move the Indians in Indiana west of the Mississippi River if it were possible to procure the consent of the tribes to such a move. At that time the Miamis would not even consider moving. In Governor Jennings' report he stated that he was unable to avoid giving the Miamis the large reservations they demanded and that he had had to grant certain tracts of lands to individuals. With respect to the large reservations made for the Miamis, Governor Jennings stated:

"To the large reservations made on account of their villages, the Indians have no higher title than that by which they formerly held the same before the cession;"

In connection with the individual grant to Richardville, the principal chief of the Miami tribe, Governor Jennings stated that without Richardville's influence the treaty might not have been negotiated and that on the occasion of the Treaty of Fort Wayne in 1809 it was Richardville who persuaded the Miamis to agree to a joint tenancy with the Delawares to the land watered by the White River. Governor Jennings also pointed out that while the annuity to the Miamis was disproportionately larger than the annuities granted to the other tribes, this was necessary because the Miamis' claim to the lands was much more extensive.

In the Treaty of October 6, 1818, 7 Stat. 189, the Miamis ceded to the United States the area of land involved in the present appeal, i. e., Area 99 on Royce's map of Indiana. The boundaries of this area had been fairly well established by the cessions and agreements described in the above-mentioned treaties, i. e., on the northeast by the boundaries of tract 87 ceded in the Treaty of September 29, 1817, 7 Stat. 160, on the east by the western boundary of Royce's Area 72 ceded on September 30, 1809; on the south by a part of the northern boundary of Royce's Area 56 ceded in the Treaty of Grouseland August 21, 1805; on the southwest by the northern boundary of Royce's Area 71, ceded by the Treaty of September 30, 1809, and on the northwest by the southeast boundary of Royce's Area 98 ceded on October 2, 1818, and on the north and northwest by the Wabash River. In Article 2 of the Treaty of October 6, 1818, certain reservations were carved out of the area ceded for the use of the Miamis, and in Article 3 the United States granted certain tracts of land in fee simple to the principal chiefs of the Miamis and to other individual Miami Indians. In Article 4 the Miamis assented to the Kickapoos' cession of Royce's Area 74 made to the United States in the Treaty of December 9, 1809. In Article 5 the United States agreed to pay to the Miamis a perpetual annuity of $15,000, together with all other annuities under former treaties, all to be paid in silver. The United States also agreed to build for the Miamis a gristmill and a sawmill wherever the chiefs might wish them built, and to provide a blacksmith and a gunsmith and to give the tribe agricultural implements and 160 bushels of salt annually. This October 6, 1818, cession of Royce's Area 99 was the last large cession in Indiana of land relinquished by the United States to the signatory tribes of the 1795 Treaty of Greenville.

On the basis of the above facts the Indian Claims Commission concluded that in the Treaty of Greenville (1795) the United States intended to and did recognize the right and title of all the signatory tribes, including the Miamis, the Weas and the Delawares, in the land relinquished by the United States within the area described in Article IV of that treaty, and that by subsequent treaties, including particularly the Treaty of Grouseland (1805) and the Treaty of Fort Wayne (1809), the areas owned by the separate tribes, including the claimants herein, were identified and located and again acknowledged by the United States to be the exclusive property of the respective tribes. The Commission also found that on October 2, 1818, the Weas ceded to the United States 815,000 acres to which that tribe had recognized title in the western part of Area 99 (7 Stat. 186), and that on October 3, 1818, the Delaware Tribe ceded to the United States its recognized one-half interest in 3,859,000 acres in the southern part of Area 99, being the country watered by the White River. The Commission also found that on October 6, 1818, the Miami Tribe had recognized and exclusive title to 4,291,-500 acres of land in Area 99 (7 Stat. 189). The Commission also found that the Pottawatomies, the Kickapoos and the Six Nations had not established any interest in Area 99. Inasmuch as there is before us no final determination involving the claims of the Weas and the Delawares, we do not pass on the Government's contentions as to the Commission's findings and conclusions on the amount of land owned by them and ceded to the United States in October 1818. With respect to the amount of land ceded by the Miamis on October 6, 1818, and the nature of their title to that land, we are of the opinion that on the basis of the facts of record and the applicable law as expressed in a number of court decisions of this court and the Supreme Court, the Commission is correct in its conclusion that the Miamis had recognized title to 4,291,500 acres of land in Indiana ceded to the United States in 1818.

■ Where Indian lands are held by so-called Indian title, i. e., aboriginal use and occupancy title, their right to occupy the land and to use it is permissive and temporary and this right or title may be extinguished by the United States at any time, with or without the consent of the Indians, and by any means which the sovereign may deem appropriate. In the absence of special legislation conferring upon some court or commission jurisdiction to adjudicate matters relative to this permissive right of occupancy, the Government's disposition of such right is a political and not a judicial matter. Northwestern Band of Shoshone Indians v. United States, 95 Ct.Cl. 642, affirmed 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985.

■ Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to *permanently* occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as "treaty title", "reservation title", "recognized title", and "acknowledged title." As noted by the Commission, there exists no one particular form for such Congressional recognition or acknowledgment of a tribe's right to occupy permanently land and that right may be established in a variety of ways. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314; Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231; State of Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954. In the instant case the Commission was of the opinion that the language contained in the provisions of the Treaty of Greenville was sufficient in itself to show the intention of the United States to "recognize" the Indians' title in the land, but the Commission did not rest its conclusion on the Greenville Treaty alone but referred to the instructions to the Treaty Commissioner, the negotiations between the Commissioner and the Indian tribes, the report of the Treaty Commissioner

concerning the negotiations and the treaty agreed upon, as well as the language of subsequent treaties and the circumstances surrounding them involving the rights of the Greenville Treaty Indians in the land relinquished by the United States in Article IV of that treaty.

Turning first to the language of Article IV of the Treaty of Greenville, we note that it states that the United States "relinquish their claims to all other Indian lands" within a well defined area, reserving therefrom certain specific tracts of land for the use of the United States. This relinquishment was stated to be in consideration of the peace which had been established between the Indians, and the United States, and of the cessions and relinquishments of land made by the Indians to the United States in Article III of the treaty. Further consideration for the relinquishment made by the United States was the permission it secured from the Indians in Article III to allow the people of the United States free passage by land and water through country belonging to the Indians along a chain of some 16 posts on tracts of land ceded to the United States by the Indians, and also for permission to the people of the United States to use the harbors and mouths of rivers along the lakes adjoining the Indian lands. It seems obvious from the language of Articles III and IV of the Greenville Treaty that the parties intended to extinguish Indian title to some areas, to confirm Indian title in, and grant permanent possessory rights to, other areas, and to secure from the Indians their relinquishment of mere claims or pretenses of claims to further areas. As further consideration for the cessions, relinquishments and rights given by the Indians to the United States, the United States undertook to give to the Indians permanent annuities in the form of goods to be delivered annually to each tribe. In Article V of the Treaty of Greenville the meaning of the "relinquishment" of the land north and west of Greenville ceded to the

Indians by the United States in Article IV is spelled out as follows:

"To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and untill such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same. And the said Indian tribes again acknowledge themselves to be under the protection of the said United States and no other power whatever."

The rights which were conferred upon the Indians by the 1795 Treaty in accordance with the above explanation in Article V of the treaty are considerably more than a right of temporary and permissive occupancy of land. The Indians were given the right to permanently as "long as they please" occupy the land without interference from the United States. The United States reserved to itself only the right to *buy* the land from the Indians, and the only restriction put upon the Indians' use of the land was that they might not sell it to any but the United States and this restriction was one placed upon all Indian tribes with respect to the disposition of their lands. In addition, the United States undertook to protect the Indians in the permanent use of their lands against all citizens of the United States and against all other persons who might intrude upon the lands.

The guarantees contained in Article V of the Treaty of Greenville were

made in strict compliance with the instructions given to General Wayne, the Treaty Commissioner. He was told to impress upon the Indians the fact that the United States conceded to them fully the right and possession of the soil as long as they desired to occupy it and that when they chose to sell it they could do so, but only to the United States who would in the meantime protect the Indians against any and all impositions. Since, in general, the United States does not have an obligation to compensate a tribe for unrecognized Indian title land (Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314), an agreement to permit the Indians to occupy land permanently or until they were disposed to sell it to the United States seemed to the Commission, as it does to us, to be a clear indication of an intention on the part of the United States to recognize in the Indian treaty parties more than aboriginal use and occupancy title to the land in question.

If we had before us only the Treaty of Greenville and if the Indian claimants were relying on that treaty alone, it would, of course, be necessary for them to prove what part of the land covered by Article IV of the treaty and relinquished to the Indians by the United States was owned by each of the claimants. General Wayne had found it impossible in 1795 to define the boundaries enclosing the various areas used and occupied by the signatory tribes. But those boundaries were established by subsequent treaties as described in the findings and decision of the Commission and as discussed earlier in this opinion. By the time the cession of October 6, 1818, was made, the boundaries of the land owned by the Miami Indians, including land owned by the Weas and the Delawares, had been established by a number of previous treaties. In those treaties and in the negotiations leading up to them, as well as in the negotiations for the Treaty of October 6, 1818, the right of the Miami Indians as the permanent and recognized owners of the lands ceded in the 1818 Treaty had been

unmistakably confirmed by the United States.

The Commission relies to a large extent on the decisions of this court involving land covered by the Treaty of Fort Laramie, September 17, 1851, 11 Stat. 749. In the case of the Indians of Fort Berthold Indian Reservation v. United States, 71 Ct.Cl. 308, the court stated that the important question for decision was whether the "reservation" claimed in the petition was fixed and set aside by treaty stipulations between the United States and the Indians and whether the treaty relied upon did in fact create the "reservation" claimed. Prior to 1851 but after the discovery of gold on the Pacific Coast, travel across the plains and through the country occupied by the Indians who later signed the Fort Laramie Treaty, was greatly increased with the result that the primary means of livelihood of the plains and mountain Indians, i. e., buffalo and game, was greatly diminished. The Indians became aroused and resisted the invasion of their lands by the white travelers. In addition, the mountains and plains Indians were continually fighting among themselves. In order to establish permanent peace and friendship among the hostile tribes, and between the tribes and the United States, to secure the permission of the tribes for the establishment of roads and military posts within their territories, to protect the Indians against the whites and the whites against the Indians, commissioners were appointed to negotiate with the plains and mountain Indians. In Article V of the Treaty of Fort Laramie the Indians agreed to recognize and acknowledge certain tracts of land included within set metes and bounds as the respective territories of the separate signatory tribes. The treaty contained no language of relinquishment or acknowledgment *by the United States* such as that contained in Articles IV and V of the Greenville Treaty involved in the instant appeal, but the court held in the Fort Berthold case that while the language of the treaty was not in all respects the technical

wording of recognition, it was sufficient, when considered in connection with the instrument as a whole and the purpose and intent of the parties as indicated by the instructions to the treaty commissioners, to clearly indicate that the territories of the signatory tribes were to be recognized in accordance with their claims, and that protection was assured to them by the Government within such limitations in consideration of the rights and privileges secured by the United States in other provisions of the treaty. Following the holding in the Fort Berthold case and without any extended discussion, the court reached the same conclusion with respect to whether or not the claimant Indians held the lands by recognized or unrecognized title in the case of the Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347. The Assiniboine Tribe was a party to the Fort Laramie Treaty and the tribe held the land described therein in exactly the same way as did the Fort Berthold Indians. The Government's attempt in the instant case to distinguish the Fort Berthold from the Assiniboine case in the light of the court's use of the word "granted" in the Assiniboine case is without merit since the nature of the land title of both tribes was governed by the same treaty. While neither the Fort Berthold case nor the Assiniboine case were passed on by the Supreme Court, the holdings in those cases were noted with approval in the decision of the Supreme Court in the case of Northwestern Band of Shoshone Indians v. United States, 324 U.S. 335, 349, 65 S.Ct. 690, 697, 89 L.Ed. 985. In the Northwestern Shoshone case the Supreme Court was of the opinion that nowhere in the treaties relied upon by the Northwestern Band was there any specific acknowledgment by the United States of the Indians' right to permanently use and occupy any area of land, and the court concluded, from the circumstances leading up to and following the execution of the Box Elder Treaty, as well as the language of the treaty itself, that neither of the parties to the treaty had intended it to constitute a recognition or acknowledgment by the United States of the Indians' right to permanently occupy the land in question. The Supreme Court then referred to the petitioner's reliance upon the decisions of the Court of Claims in the Fort Berthold and Assiniboine cases, supra, and in Crow Nation v. United States, 81 Ct.Cl. 238, and noted that a different conclusion on the question of treaty recognition of title in the Northwestern Shoshone case was not inconsistent with the holdings of the Court of Claims in the Fort Laramie cases because different treaties were involved. The Supreme Court stated that the circumstances surrounding the execution of the Fort Laramie Treaty indicated "a purpose to recognize the Indian title to the lands described in the Fort Laramie treaty which may well have induced the Court of Claims to reach one conclusion in those cases and another in this." The Supreme Court then went on to note that the instructions to the Fort Laramie Treaty Commissioners had directed them to establish for each tribe some fixed boundaries within which they would agree to reside and not intrude upon the limits assigned to another tribe without permission, and that the United States had considered it highly important to lay off the country into geographical or national domains. In the instant case we are of the opinion that the language of the Treaty of Greenville was far more apt to express "recognition" than was the language of the Fort Laramie Treaty and that the circumstances surrounding the execution of the Greenville Treaty indicate a clear purpose on the part of the United States to recognize the right of the signatory tribes to permanently occupy the land relinquished by the United States in that treaty.

■ It is somewhat difficult to determine the exact nature of the Government's arguments with respect to the Commission's holding on recognition, but one thing seems clear and that is that the concept which the Government urges with respect to what constitutes "recognized title" is unduly restrictive. The

lands which Indians hold by recognized title may be lands formerly held by them under mere aboriginal use and occupancy title or may be lands which they never previously occupied and which the Government conveyed or granted to them. The land which an Indian tribe holds by recognized title may be called a "reservation" in the applicable treaty, agreement or statute, or it may not be called a reservation. The area may be a large tract of land [4] sufficient to support a numerous population of Indians without much assistance from the sovereign, as in the case of the Fort Laramie tribes, or it may be a small tract on which the tribe can live only with considerable Government assistance. The size of the tract involved is not controlling on the question of recognition. At the time of the negotiations of the Treaty of Greenville, the United States in 1795 had no immediate need for the admittedly large area which the Commission has found it recognized as being owned by the signatory tribes and which the United States agreed that those tribes should thenceforth occupy on a permanent basis. Since the United States then had no immediate need for the land in question, there was no reason to confine the Indians to small tracts which would have required the United States to undertake many obligations in the form of larger annuities and numerous services necessary to enable the Indians to exist on small tracts of land. By "recognition", the courts have meant that Congress intended to acknowledge, or if one prefers, to grant, to Indian tribes rights in land which were in addition to the Indians' traditional use and occupancy rights exercised only with the permission of the sovereign. Those additional rights may be sufficient to spell out fee simple title in the Indians if that is what Congress wished, or they may result in something less than fee simple title. The extent of those new and additional rights and the accompanying obligations of the sovereign and the tribe will usually be determined by the Congressional enactment, the treaty, or the agreement, conferring them. Sometimes, as in the case of the Fort Laramie Treaty, it is necessary to look to the negotiations leading up the treaty and the reports of the treaty commissioners to accurately determine the precise nature and extent of the rights and obligations created by the treaty.

In the instant case we are of the opinion that the Indian Claims Commission has correctly held that the Miamis were given the right to permanently occupy and use the land ceded by the Treaty of October 6, 1818, until that tribe should be disposed to sell that land to the United States; that the title of the claimant Indians in the land so ceded was what is understood as "recognized" title and that because of such recognition, the claimant Indians did not have to establish the extent of their exclusive occupancy of any of the land ceded to the United States in 1818; and that the Commission has accurately determined the amount and location of land in the ceded tract belonging to the claimant Indians.

We turn next to a consideration of the issues raised by the cross-appeals from the Commission's determination that the land ceded by the claimant tribes under the Treaty of October 6, 1818, was worth on that date 75¢ an acre. The Indian claimants contend in general that the Commission's ultimate finding of value is not supported by the primary findings; that the primary findings numbered 6 through 31 are supported by substantial evidence contained in the whole record; that the remaining findings on value, numbers 32 through 44, are either merely recitations of evidentiary material and not findings, or, in some instances, are contradictory to findings previously made by the Commission and are not supported by substantial evidence.

The United States urges that the Commission's ultimate finding of 75¢ per acre

4. In the Fort Berthold case the court held that the Indians had recognized title to some 13,000,000 acres of land; in the Assiniboine case the court held that the tribe had recognized Indian title to over 6,000,000 acres of land.

as the value of the land in 1818 is not supported by the Commission's primary findings; that some of the primary findings contain uncertainties and conflicts and that the case should be remanded to the Commission for correction both as to primary findings and the ultimate finding of value. With respect to findings 6 through 31 which the Indian claimants contend are supported by substantial evidence, the Government contends that these findings are mere generalities and are not supported by substantial evidence. The Government says that findings 33 through 40 are supported by substantial evidence and that if the Commission had made certain additional findings from the record it would have reached a valuation as of October 6, 1818, of only 20¢ per acre for the land ceded.

Section 19 of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70, provides that the final determination of the Commission in any case shall include the findings of fact upon which its conclusions are based, *and a statement of its reasons for its findings and conclusions*. Section 20(b) of the Act defines the scope of this court's power to review final determinations of the Commission and provides in pertinent part as follows:

" * * * On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting 'fair and honorable dealings', where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact."

In the instant case we must determine whether certain primary findings are supported by substantial evidence, whether other findings are, in fact, findings or mere recitations of evidence, whether the ultimate finding or conclusion with respect to value is supported by the Commission's primary findings of fact, and whether the Commission has given adequate and valid reasons for its findings and conclusion on the issue of value.

On the question whether or not the case should be remanded to the Commission for correction and modification of the findings both parties have cited this court's decision in Snake or Piute Indians of Former Malheur Reservation in Or. v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241. The Snake case is not precisely in point. In that case the court was faced with a related problem. We found that the evidentiary findings made by the Commission were accurate and were supported by substantial evidence but that the findings made did not adequately reflect the whole record and failed to present certain essential facts which were established by the record. Inasmuch as the court felt that the whole record, if made the subject of proper findings, did not support the ultimate finding made by the Commission, the case was remanded to the Commission for the making of additional primary findings.

The case before us presents a situation where the primary findings are generally adequate to reflect the essential facts established by the record, but those findings do not support the Commission's ultimate finding on value. In the case of Penn Foundry & Manufacturing Co. v. United States, 75 F.Supp. 319, 110 Ct.Cl. 374 reversed, 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308, this court awarded judgment to a manufacturer for loss of anticipated profits under a contract for the manufacture of gun mounts for the Navy, the contract having been canceled by the Government a few days after it was awarded. The Supreme Court reversed this court's decision on the ground that the primary findings made by the court did not show that the plaintiff manufacturer was ready and able to perform its contractual obligations; that such readiness and ability to perform were indispensable prerequisites to the plaintiff's right to recover loss of anticipated profits and that because certain findings of fact conclusive-

ly established that the plaintiff was neither ready nor able to perform the contract, a finding of readiness and ability could not in fact have been made. In that case the court had made no finding at all as to that essential fact. In the instant case the Commission did make an ultimate finding on the issue of value, but both parties contend that the primary findings made by the Commission require an entirely different ultimate finding.[5]

Before we examine the Commission's findings we will discuss certain general principles which are applicable in a determination of the value of Indian land at a time in the remote past.

■ First we wish to observe that whether the land to be valued is held by the Indian claimants under recognized title or merely under so-called Indian title, or is held under fee simple title with all the usual rights of ownership, including that of alienation, the Supreme Court and this court have held that such land should be valued in the same way. In the case of United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213, the Court of Claims, in valuing land held by recognized title, had included in such valuation the worth of the timber and minerals in the area. On appeal the Government had urged that the Indians' title being less than fee simple in that it merely included the right to use and occupy the land, the value of that land must be less than land held under fee simple title. The Supreme Court said:

"For all practical purposes, the tribe owned the land. Grants of land subject to the Indian title by the United States, which had only the naked fee, would transfer no beneficial interest. Leavenworth, L.

& G. R. Co. v. United States, 92 U.S. 733, 742–743, [23 L.Ed. 634]. Beecher v. Wetherby, 95 U.S. 517, 525 [24 L.Ed. 440]. The right of perpetual and exclusive occupancy of the land is not less valuable than full title in fee." 304 U.S. at page 116, 58 S.Ct. at page 767.

The same issue on value was present in the case of United States v. Klamath and Moadoc Tribe of Indians, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 and the same holding was made in that case.

In the case of Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, certiorari denied 350 U.S. 848, 76 S.Ct. 82, 100 L. Ed. 755, this court held that both Indian title land to the extent that actual occupancy thereof was proved, and reservation or recognized title land, should have the same value as though it were held in fee simple rather than on the basis of its value as subsistence for primitive Indian occupants as suggested by the Government appraiser. In its petition for certiorari, the Government again urged this theory of valuation.

In the case of Coeur d'Alene Tribe of Indians v. United States, 6 Ind.Cls.Comm. 1, 38, the Indian Claims Commission held that land held by Indian title (mere permissive use and occupancy title) had the same value as land held by recognized or reservation title or as land held by fee simple title, citing the Shoshone and Klamath cases, supra, as well as United States v. Paine Lumber Co., 206 U.S. 467, 27 S.Ct. 697, 699, 51 L.Ed. 1139. In the Paine Lumber case the Supreme Court, noting that usually Indian tribes were not permitted to alienate their lands, stated that "The restraint upon alienation must not be exaggerated. It does not of itself debase the right below a fee simple."

---

5. The instant case is similar in another respect to the Penn Foundry situation. There this court had made an ultimate finding that if the plaintiff had been permitted to perform its contract, it would have made a net profit of not less than $80,000, and the court entered judgment for that amount. There were no evidentiary findings or primary findings on the subject of damages or the computation of anticipated net profits, just as there are no primary findings supporting the Commission's ultimate finding of value in the instant case. The Supreme Court discussed this issue but did not base its decision upon it.

The problem of valuation may arise in at least three possible settings: (1) where there is neither an open market nor other evidence upon which to base an estimate of fair market value, in which event the courts have held that the Government's minimum statutory price for public land may be considered to be the value of that land; (2) where there is an open market for the land in question so that the actual market value of the land is known or can be ascertained; (3) where there is no open market for the land in question but there is evidence of sales of comparable land in the same area at about the same time which, together with other evidence, justifies a conclusion as to the fair market value of the land being valued. A situation of the first type was present in New York Indians v. United States, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927, and 170 U.S. 614, 18 S.Ct. 735, 42 L.Ed. 1165. The other two situations mentioned above are really two aspects of the same thing, i. e., the fair market value approach, one being actual fair market value and the other being an estimated or imputed fair market value. Fair market value was defined by the Indian Claims Commission in The Osage Nation of Indians v. United States, 3 Ind.Cl.Comm. 231, as follows:

> "Market price is the highest price estimated in terms of money which land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all the uses and purposes to which it is best adapted and for which it is capable of being used."

If, as in The Osage case, there is evidence of private sales not controlled by the Government's minimum statutory price for public lands, these sales should be taken into consideration in determining value. In addition, consideration should be given to evidence of sales of reserve sections; sales of land at public auction, bearing in mind the duration of the auction; the location and physical characteristics of the land; the type of settlers who purchased the land and their ability to pay for it; and the history and development, both political and economic, of the area in which the land is located. The evidence as a whole, taking all these factors into consideration, may show that the fair market value of the particular land involved is actually less than the Government's statutory minimum price for public land. Such was the case in Rogue River Tribe of Indians v. United States, 1950, 89 F.Supp. 798, 116 Ct.Cl. 454, certiorari denied in 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342. On the other hand, such evidence may show that the fair market value of the land in question is more than the statutory minimum price for public lands as was the case in The Osage Nation of Indians v. United States, supra.

In the instant case, as in most cases involving Indian lands, there was no actual free open market in the precise area ceded to the United States in 1818, because the Indians had been unable, prior to the cession, to sell their land to anyone but the United States, and the United States bought the whole tract in 1818. As a result of the Trade and Intercourse Acts; 1 Stat. 137, 138 and 1 Stat. 329, 330, and under the provisions of the Treaty of Greenville of 1795, 7 Stat. 49, the Indian tribes of the Northwest Territory could only sell their land to the United States or with the approval of the United States. Prior to 1818 the Miami Indians had requested the right to sell their lands directly to settlers, but the United States had refused to grant them such permission (finding 29).

In the case of the New York Indians v. United States, supra, there was no open market for the land in question, nor was there evidence upon which a fair market value could be estimated. Accordingly, the Supreme Court directed that judgment be entered for the net amount actually received by the Government when it sold the lands at the statutory minimum price, plus an amount which the lands disposed of other than by sale would have brought had they been sold as public lands for the Government's statutory minimum price. In the instant case the Commission did not even allow

a recovery on the basis of the minimum statutory price for public land at the time of the cession, which was $2.00 an acre, nor on the basis of the reduced minimum statutory price of $1.25 per acre which was established two years after the cession, although the Commission found that nearly all of the land ceded in 1818 was sold by the Government after its acquisition for at least $1.25 per acre. In the New York Indians case, the Supreme Court did not permit the Indians to be penalized because the Government had not chosen to sell most of the lands involved in that case, and accordingly, the Indians were allowed to recover the amount for which the lands could have been but, for political reasons, were not, sold as public lands.

Had the Commission in this case been faced with the New York Indians situation of no evidence of market value, the Commission would have been justified in considering the statutory minimum price in effect in 1818, i. e., $2.00 per acre, particularly where there was ample evidence that public lands in the vicinity which were neither as desirable nor as accessible were sold for prices equalling and exceeding the previous minimum statutory price of $2.00 an acre. However, in this case there is evidence, and there are primary findings reflecting such evidence, upon which to base a finding of the fair market value of the lands in question, and it was unnecessary for the Commission to rely solely upon the statutory minimum price for public land.

■ The Commission in this case has made numerous findings on the various elements and factors relating to value which this court and the Commission have previously considered to be proper for a determination of value. Alcea Band of Tillamooks v. United States, 1950, 87 F.Supp. 938, 115 Ct.Cl. 463; Rogue River Tribe of Indians v. United States, supra; Otoe and Missouria Tribe of Indians v. United States, 1955, 131 F.Supp. 265, 131 Ct.Cl. 593; United States v. Kiowa, Comanche, and Apache Tribes of Indians, D.C., 163 F.Supp. 603, decided July 16, 1958, and Osage, supra.

In findings 6 and 7 the Commission has described the location and physical characteristics of the lands here in question which were ceded on October 6, 1818. This land is identified on Royce's map of Indiana as Area 99 and is referred to by the Commission and in documents contemporaneous with the sales as "The New Purchase." The land is situated in central Indiana just south and east of the Wabash River and is watered by numerous navigable streams. It was crisscrossed by well-used trails and was readily accessible to emigrants and settlers. Because of its location with reference to the Wabash and Ohio Rivers and to Lake Erie and Lake Michigan, the area was in the direct path of western commercial growth. There were streams in every township and the area contained much potential water power. The area contained some of the most desirable land in all of Indiana for agricultural purposes, there being rich bottom lands, level undulating uplands and rolling uplands. Swamp and marsh lands which were not useful as agricultural land, comprised less than one percent of the area. The best use for the lands in the so-called New Purchase area was for development by settlers as homesteads and the lands were considered by contemporaries to be the best available for that purpose in Indiana and as good or better than any comparable lands in the Northwest Territory.

At this point we note that in a letter dated October 28, 1818, from Governor Jennings, one of the treaty commissioners to negotiate the 1818 treaty, to the Secretary of War, he stated that the land which had been acquired from the claimant Indians was "not equalled by any in the state." This letter was not introduced in evidence. It may be found in the records of the War Department at the National Archives. Furthermore, in a letter from Treaty Commissioner Lewis Cass, dated June 19, 1818, to the Secretary of War, it was stated that because the country to be purchased from the Indians in Indiana "is probably equal to any in the world" powerful induce-

ments for the cession would have to be offered to the Miamis.

In findings 9 and 10 the Commission discussed the development of the areas of land bordering on the cession here in question, apparently for the purpose of comparing such adjacent areas with the New Purchase as to quality and quantity of land made available for settlement, the demand for such lands, and the rate of disposal. All of the adjacent land discussed had been ceded to the United States by the Indian owners prior to 1818 and much of it had been disposed of to settlers prior to that date.

Some 3,150,299 acres of land known as the "Greenville lands" had been ceded to the United States under the Treaty of Greenville, August 3, 1795, 7 Stat. 49, and were opened for settlement in 1800. Approximately 681,298 acres of the Greenville lands lay on the eastern border of Indiana in a small tract known as "The Gore", apparently because of the triangular shape of the area. The rest of the Greenville lands lay in western Ohio. By 1818 approximately 73.3 percent of all of the Greenville lands, and 86.3 percent of the lands in the Gore had been disposed of.

There were 1,202,262 acres of land in an area known as the Vincennes Tract located in southwestern Indiana and ceded to the United States under the 1795 Treaty of Greenville (Royce's Area 26). This tract was not opened for settlement until 1807 and disposition and settlement of this area was retarded because of existing French settlements. Furthermore, as noted earlier in this opinion and in the findings of the Commission, the boundaries of the Vincennes Tract were not definitely settled until the Treaty of June 7, 1803, 7 Stat. 74.

An area of 1,557,833 acres of land in southeastern Indiana was ceded to the United States in the Treaty of Grouseland of August 21, 1805, 7 Stat. 91. This tract, known as the "Grouseland Cession", was opened for settlement in 1808, and by 1818 one-half of this area had been disposed of.

Another tract, known as the "Harrison Purchase", comprising 2,230,816 acres of land was ceded to the United States on September 30, 1809, 7 Stat. 113 (Royce's Area 71). It was located in west central Indiana, was opened for settlement in 1816, and by 1818 one-fourth of it had been disposed of.

A tract of 558,149 acres of land in eastern Indiana known as the "Twelve Mile Strip" (Royce's Area 72) was ceded to the United States on September 30, 1809, 7 Stat. 113. The tract was opened for settlement in 1811 and by 1818 nearly 60 percent of this tract had been disposed of.

The Commission found that none of the tracts described above were on the whole as good as the land included in the New Purchase Cession of 1818, and by October 6, 1818, good lands in these adjacent areas were available only by purchase from prior settlers rather than from the Government, and only at very high prices. All the good land in the more distant parts of the country east and south of Indiana had been settled upon and little good land remained.

In finding 11 the Commission found that the settlement of the whole Northwest Territory followed a set pattern wherein the settlers followed the most accessible routes and took up the most desirable of the accessible lands first. The first settlements in any new area increased the desirability and the accessibility of all adjacent areas. Although the Commission drew no conclusion from this finding, it is obvious from the facts found earlier, that the settlement of the Greenville lands the Twelve Mile Strip, the Harrison Purchase, the Grouseland Cession, and the Vincennes Tract prior to 1818, increased the desirability, accessibility and consequently the market value of the New Purchase acquired by the United States in 1818 and opened for settlement in 1820.

In subsequent findings the Commission discussed the various ways in which public lands were disposed of from 1787 to 1818, the prices at which the lands were

disposed of and the type of land disposed of both by the Government and in private sales between settlers. In finding 12 the Commission noted that between 1787 and 1795 several large tracts of public land had been sold to land speculators at prices which steadily increased from 8 or 9¢ an acre in 1787 to 40¢ an acre in 1795. Much of this land was inaccessible at the time of purchase; because of distance from existing settlements, the market for it had not been developed. Because of the poor choice of lands made by the speculators, and because of improper financing and mismanagement, most of the land companies failed and there resulted a popular revulsion against land speculators. None of the land involved in the era of land speculation was close to the New Purchase and for many years prior to 1818 there had been no activity of this kind. Although the Commission does not express such a conclusion it appears that the Commission was of the opinion that the prices paid by the land companies in the eighteenth century for land far distant from the New Purchase lands would have no bearing on the value of those lands in 1818.

In finding 13 the Commission found that it was the Government's policy to permit the Indians in the Northwest Territory to sell their lands only to the United States and that the United States in turn sold the land directly to the settlers pursuant to statutory procedures and at prescribed prices. Between 1800 and 1820 the statutory minimum price for public land in this area was $2.00 per acre, payable in four equal installments over a period of four years, and the Government's purpose in setting the price at $2.00 an acre was not to secure the most that could be obtained for the public lands, but to make the lands available for quick settlement at what was considered to be a nominal price. After 1804 settlers could not buy less than 160 acres at a time, and there was no discount for purchases of larger tracts.

In addition to sales to individual settlers at the minimum statutory price per acre of $2.00, public auctions were held at which sales were made to the highest bidder. Those auctions, however, were held for short periods of from one to three weeks after which the lands were open to private entry at the minimum price of $2.00 per acre. The Commission noted that competition was minimized by combinations among buyers who had already settled upon the land or had chosen the locations they desired to purchase, and also by reason of special priorities such as preemption rights granted in the district and military bounties which were granted in southern Indiana to Canadians who had served in American forces. The Commission found that the minimum price of $2.00 per acre for public land thus tended to become the maximum.

In its finding 20 the Commission found that the land most comparable to the New Purchase in size, quality and accessibility was the Greenville land ceded to the United States in 1795 and opened for settlement in 1800, and the Twelve Mile Strip in eastern Indiana ceded to the United States in 1809 and opened for settlement in 1811. The Commission found that when the Greenville lands were opened for settlement in 1800 the prospect of rapid settlement was less favorable than the prospect for settlement of the New Purchase in 1818, because their northern and western borders were still Indian frontiers, the population in western Ohio was less than three persons per square mile, Indiana was not settled at all, and neither Ohio nor Indiana had been organized as a state. In 1811 when the Twelve Mile Strip in eastern Indiana was opened for settlement its western and northern borders were Indian frontiers. Indiana was not yet a state and the population of Indiana was only 1.3 persons per square mile. On the other hand, when the New Purchase was acquired by the United States in 1818, the area was surrounded on the east, south and southwest by areas which had been previously opened to settlement and were largely settled, and only the north and northwest borders of the New Purchase were still bounded by Indian lands.

Furthermore, both Indiana and Ohio had become states and the population density on the borders of the New Purchase had so increased that by 1820 Ohio averaged 14.7 persons per square mile, and the Greenville lands on the eastern border of the New Purchase averaged 27.7 persons per square mile. The Commission also noted that the year 1818 marked a peak of the "Great Migration" into the Northwest Territory and that more public lands were sold in that year than in any prior year. The Commission found that anyone attempting to predict what the development of the New Purchase would be at the time of the cession in 1818 would have given consideration to the history of the development of the Greenville lands and the Twelve Mile Strip, which included lands of similar character and involved an area of comparable size. The other tracts described in findings 9 and 10, that is, the Harrison Purchase, the Grouseland Purchase and the Vincennes Tract, furnished less appropriate guides since the Harrison Purchase was not opened for settlement until 1816, the Grouseland cession (Royce Area 56) had frontiers which were more exposed than the frontiers of the Greenville lands, and the Twelve Mile Strip, and the Vincennes Tract settlement had been impeded by the presence of French settlements. In finding 21 the Commission noted that more than 70 percent of the lands contained in the Greenville area and the Twelve Mile Strip had been disposed of prior to 1818, and that considerable land had been disposed of in the other less desirable areas described above. The Commission said that the defendant's appraiser had inaccurately determined the rate of sale in the Vincennes Tract, the Harrison Purchase and the Grouseland Cession because he had included in the lands as available for sale lands which had been reserved for school grants, private claims and other lands which the Government had withdrawn from the market.

In finding 22 the Commission concluded that because of the rate of sales of comparable and adjacent lands, the rate

of disposition of the New Purchase could reasonably have been predicted in 1818 and that after making all proper allowances, it could have been reasonably predicted at that time that 90 percent of the New Purchase lands would be disposed of within 20 years. In finding 23 the Commission found that in the 20 years subsequent to 1820 when the lands in suit were opened for settlement, 91.7 percent of the land was sold to settlers.

In finding 16 the Commission described the type of settler who moved into Northwest Territory in general and Indiana in particular during the years prior to 1818. The settlers were largely English, Scotch-Irish and Quakers, and were farmers of the middle class who had money with them to pay the $80 required as a down payment on the 160-acre farms. These settlers brought with them their hogs, cattle, tools, implements and household goods and most of them were able to raise the additional $80 a year from the sale of their hogs, cattle and produce to pay the subsequent three installments. The settlers were self-sufficient and their ability to pay for the land was not affected by general financial conditions and depressions which adversely affected people who were engaged in business. They cleared only that portion of their 160-acre tracts which they needed to establish a self-sustaining farm and the remaining acreage was usually left in its original wooded state and was disposed of by the farmers at a later time. In finding 17 the Commission found that the settlers in Indiana seldom defaulted in their payments, and that the principal defaults which gave rise to criticism of the credit system engaged in by the Government in the sale of its public lands occurred in Alabama and not in the Northwest Territory.

In finding 18 the Commission found that 1818 was a year of unprecedented optimism and that the fluctuations of the business cycle did not affect the trend of settlement in the Northwest Territory since shortages of currency and credit were easily solved in that area by barter.

In finding 19 the Commission described the steady increase in the sales of public land in the Northwest Territory from 1814 through 1839.

In finding 24 the Commission again noted that since almost any land in the public domain was available prior to 1820 at $2.00 per acre regardless of quality or location, there was no incentive to the purchaser to pay more than the price which all authorities, including those cited by defendant, considered to be nominal. The Commission concluded that Government sales were therefore of little assistance in determining the actual market value of lands adjacent to the New Purchase or of lands in the New Purchase but that in addition to the nominal Government price for land, the record contained evidence of two other types of sale by the Government which gave a better idea of the actual value of the land. These types of sale described by the Commission in findings 25 and 26 were sales of so-called reserved sections and sales made at public auction.

The Commission found (finding 25) that in the Greenville area the Government demonstrated the possibility of obtaining an average rate substantially in excess of the $2.00 per acre minimum statutory price for public land. By statute in 1796 it was provided that the central sections of each township might be reserved for future disposition by Congress. In 1805 Congress authorized the sale of these reserved sections at a minimum price of $8.00 an acre, and between 1805 and 1808 2,972 acres of reserved sections in the Greenville lands were sold for that price.

In 1808 Congress reduced the minimum price of the reserved sections to $4.00 an acre and during the next 10 years 116,085 acres of such reserved sections were sold at or above the $4.00 per acre minimum price. During the same period of time, unreserved land was selling at $2.00 an acre. The Commission noted that the selection of the reserved setions was arbitrarily made by section number without reference to the quality of the sections reserved and that as a consequence the reserved sections were of the same quality as the unreserved sections immediately surrounding them. The Commission therefore concluded that the substantial sales of the reserved sections would never have taken place if the $2.00 minimum price had been a fair measure of market value in the Greenville lands. It also concluded that if all the Greenville lands had been priced at $8.00 or $4.00 an acre and if the purchasers had been permitted to take 80-acre tracts instead of 160-acre tracts, the rate of disposition of the lands probably would have been substantially increased.

In finding 26 the Commission described the procedure of selling lands at public auction in the Northwest Territory. It noted that the auctions were for short periods lasting from one to three weeks; that activity at public auctions was probably retarded because people knew that substantially comparable land would shortly be available at the minimum price of $2.00 an acre. The Commission also noted that squatters on the land banded together to prevent competitive bidding and the Government did little to prevent the squatters from asserting their claimed preemptive rights which were ultimately recognized by Congressional enactments, but that despite these deterrents, the record showed a substantial number of sales at public auctions above the $2.00 minimum. Those prices ranged from $2.00 to $8.00 an acre.

In finding 27 the Commission turned to evidence of so-called free sales between settlers in areas adjacent to the New Purchase prior to the 1818 cession. This evidence was in the form of deed records which usually showed the acreage involved and the price paid, although the nature and extent of improvements, if any, on the land sold, was not always shown by the deeds. The record indicated to the Commission that land in the Twelve Mile Strip prior to 1818 was resold by settlers in tracts of 40 acres or more at prices averaging $5.87 per acre. The average maximum period between original entry on any tract and its resale

was found to be 7½ years. The Commission found that most of the tracts had been resold in substantially shorter periods following original entry and that the average farm resold could not have been subject to much improvement for more than five years after purchase, since the average settler did not clear a total of more than 30 to 40 acres of his main 160-acre tract and the improvements on the cleared section consisted primarily of a log cabin and a small amount of fencing. After estimating the cost of this type of improvement, the Commission concluded that the average net resale price of lands in the Twelve Mile Strip was about $4.46 per acre for unimproved land.

In finding 28 the Commission stated that between 1815 and 1818 first rate unimproved land in southern Indiana and western Ohio sold for from $4.00 to $8.00 per acre even when remote from villages and towns and that much higher prices were obtained when the tracts were near settlements. The Commission found that Government officials expected sales in the Harrison Purchase (Royce's Area 71) opened for settlement in 1816 and immediately adjacent to the New Purchase on the southwest would be from $6.00 to $8.00 an acre. Prices as high as $30.00 per acre were actually realized during the public sales period in the Harrison Purchase.

Lands adjacent to the New Purchase in western Ohio were selling in 1818 for from $4.00 to $8.00 an acre in areas remote from villages; unimproved fertile lands near settlements sold for an average of $8.00 an acre; unimproved land close to principal villages sold from $20.00 to $40.00 an acre; land within 12 miles of Cincinnati sold from $12.00 to $30.00 an acre and, on occasion, sales were made for $150.00 an acre within three miles of Cincinnati. The Commission noted that during the time these prices were being paid, Government-owned land was selling for $2.00 an acre. Finding 28 contains a table showing the prices obtained for unimproved and slightly improved lands in areas near the

New Purchase between the years 1815 and 1818, and the prices ranged from a low of $2.50 an acre to a high of $150.00 an acre.

In finding 31 the Commission found that the average cost to the Government of surveying and selling public land at the time of the 1818 cession was 6.2¢ per acre.

In finding 14 the Commission found that following the ratification of the Treaty of October 6, 1818 under which the Government acquired the lands in suit, Congress intended to sell these lands on the same terms upon which other public lands had been marketed, that is, at the minimum statutory price of $2.00 per acre, but that just before the lands were opened for sale in 1820, Congress passed new legislation reducing the minimum price for public lands from $2.00 to $1.25 per acre payable in cash. The reduction in the minimum price for public land was the result of political rather than economic considerations (finding 15) and was a continuation of the Government's earlier policy, described in finding 13, of selling the land to settlers at a nominal price rather than securing for the Government the most that could have been obtained for the land. The Commission found (finding 14) that the new $1.25 minimum price for public land subsequent to 1820 tended to become the prevailing market price of public lands as had the earlier $2.00 minimum price and that most of the lands in the New Purchase sold for $1.25 per acre although many sales were recorded at prices higher than this minimum, particularly during the early sales in 1820, 1821 and 1822. The benefits of the Graduation Act of August 4, 1854, 10 Stat. 574, permitting the sale of land which had been on the market for more than ten years to be sold at reduced prices, was invoked by purchasers on the land in suit in connection with less than one percent of the land in the New Purchase.

The Commission found (finding 29) that the highest and best use for the land in suit was for development by settlers as homesteads, a fact of which the

Indian owners of the land were well aware. The Commission further found that in the negotiations for the treaty of September 30, 1809, the Miamis had requested permission of the Government to sell their lands directly to the white settlers but that the Government had refused to allow them to do so.

The Commission did not make findings concerning private sales between settlers of land in the New Purchase although the record contains evidence of such sales. Neither did the Commission make findings to reflect the fact that the United States considered the land of such value that it authorized (reluctantly) its treaty commissioners to offer special inducements to influential members of the tribe by way of individual grants in fee. In the letter of instructions, dated June 29, 1818, to Lewis Cass, the treaty commissioner was told to make such grants only as a last resort, the instructions saying:

"Should it be found indispensable to the formation of a treaty, on satisfactory conditions, that some lands should be ceded in fee to some few persons in the tribe, half-breeds, or others of great influence, it may be done, guarding the sales in the manner above stated. This, however, should be avoided, if possible, as it would be to sacrifice the interest of the tribe to the accommodation of individuals—perhaps of the innocent and ignorant to the artful and unprincipled."

In Article 3 of the 1818 Treaty a number of tracts of land were granted in fee simple to influential half-breeds and tribal members and in Article 6 it was provided that except for the tracts granted to Jean Baptiste Richardville, the tracts so granted could not be transferred by the grantees or their heirs without "the approbation of the President of the United States." The grant to Richardville was absolute in all respects. In his report of October 28, 1818, following the execution of the 1818 Treaty, Governor Jennings, one of the treaty commissioners, advised the Secretary of War that the Miamis had a very good idea of what their land was actually worth from the white settlers in the vicinity and that it had therefore been impossible to secure the huge land cession on any better terms than that included in the treaty. He noted that it had been necessary to make the grants in fee simple to the influential individuals but that those individuals, with the exception of Richardville, could not dispose of their lands without the permission of the President. He then stated that although the consideration given the Miamis for the land, including the annuities, might seem large in comparison with the consideration given other tribes for adjacent lands, he felt that a good bargain had been made for the United States since the land ceded by the Miamis was of a type "not equalled by any in the state."

With respect to the above mentioned fee simple grants to influential half-breeds, the Commission failed to make findings to the effect that pursuant to Article 7 of the Treaty of October 23, 1826, 7 Stat. 300, some 6,720 acres of those lands were repurchased by the Government at prices ranging from $3.84 to $6.90 per acre. This was only eight years after the same land had been granted to the individual Indians for the admitted purpose of inducing those individuals to exert their influence on the tribe to secure the large cession desired by the United States in 1818. The total amount expended to reacquire that land in 1826 was $25,780.00.

Before we proceed to anaylze the remaining findings made by the Commission on the matter of the value of the land ceded to the Government in 1818, we wish to state that we have examined the record upon which the findings already discussed were based, and that the findings are fully supported by the evidence. Why the Commission failed to make an ultimate finding drawing the obvious conclusions from the carefully prepared findings 6 through 31 we do not know.

Finding 32 is merely a summary of certain conclusions reached by the plaintiffs' appraiser with respect to the prob-

able value per acre of the lands in the New Purchase as of October 6, 1818. It would appear that the Commission had before it sufficient evidence to form its own opinion of the probable value of the lands in the New Purchase without the assistance of the plaintiffs' appraiser, although much of the evidence relied upon by the Commission in making its findings 6 through 31 was the same evidence used by the plaintiffs' appraiser. In arriving at a value of 75¢ per acre the Commission appears to have chosen to ignore its own findings 6 through 31, as well as the opinion of the plaintiffs' appraiser summarized in finding 32.

In finding 33 the Commission summarized the material found in certain Senate documents with respect to land purchased from Indians throughout the United States prior to 1818, and the amount of such land that had been disposed of by that date. The Commission drew no conclusion from the material summarized and it would appear that that material has no relevancy to the issue of value in the instant case.

In finding 34 the Commission summarized a Treasury report of November 24, 1818, including the fact that the United States was paying six and seven percent interest on the greater portion of its national debt. The relevancy of this material to the issues involved in this case is not apparent. The same may be said of finding 35 in which the Commission summarized a Treasury report of April 23, 1832.

Finding 36 contains a most curious statement to the effect that from the beginning of the sale of public lands by the United States to 1818 and thereafter, the United States was attempting to obtain the "high dollar" from the sale of its public lands. This statement is directly contrary to statements made in previous findings noted above that, in setting the minimum price for public lands at $2 an acre prior to 1820 and at $1.25 an acre in 1820, the United States was not attempting to secure for itself the "high dollar" or even the true value of the public lands it was disposing of

but was rather, as a matter of public policy, setting the price for such public lands at what was considered to be a very nominal figure in order to get more lands into the hands of the settlers. The record as a whole supports the conclusion reached by the Commission in the earlier findings. The conclusion reached in finding 36 is not supported by substantial evidence and is contrary to earlier findings which are supported by substantial evidence based on the record as a whole.

Finding 37 notes that in 1820 the credit system used in the sale of public lands was abolished and the minimum price for such lands was reduced to $1.25 per acre with sales permitted in whole, half, quarter and half-quarter sections. Under the general Relief and Relinquishment Act of March 2, 1821, 3 Stat. 612, settlers were authorized to relinquish part of their lands in satisfaction of the debt on the remainder. In view of the Commission's findings 15, 16, and 17 to the effect that typical settlers in the area surrounding the New Purchase had the money to pay for their land and few, if any, defaulted in meeting such payments, it would appear that the passage of the Relief and Relinquishment Act was not for the benefit of these settlers and was not taken advantage of by them. Accordingly, the circumstances relative to defaults in other parts of the United States which occasioned the passage of this Act would have no bearing on the value of the land in the New Purchase in 1818. Finding 37 of the Commission does not indicate that it was the Commission's opinion that this Act did have any bearing on the value of the New Purchase lands. Finding 38 discusses the market price obtained for lands in Kentucky prior to 1820 but the Commission states in the finding that Kentucky lands were not comparable to lands involved in the instant lawsuit.

Finding 39 is concerned with large sales made by land speculators between 1788 and 1795 but the Commission states that neither the lands nor the period involved are comparable with the land and

the period involved in the present lawsuit.

In finding 40 the Commission recites certain statistics which show that as a whole the country had more land than it had money. The finding quotes pages from Harvard Economic Studies relative to financial depressions prior to 1820. In view of the Commission's findings 16–18 that settlers in Indiana who were farmers were not affected by the financial crisis in the period prior to 1818, the relevancy of this finding is not apparent.

In finding 41 the Commission quoted a statement by the defendant's appraiser but makes no independent finding as to the sigificance of that statement which, indeed, is a rather vague and general one. In finding 42 the Commission again summarizes certain statements made by the defendant's appraiser with respect to land available in Indiana prior to 1819 and land actually disposed of. In finding 21 the Commission had pointed out that the defendant's figures with respect to land available and disposed of in earlier Indiana and Ohio cessions were inaccurate because of the failure to eliminate land reserved by the Government from public sale for schools and other purposes. The Commission also found in earlier findings that four of the tracts selected by the defendant's appraiser for comparison with the New Purchase were dissimilar to the New Purchase in quality of soil, and that two of the tracts selected (the Vincennes Tract and the Ohio River Tract) were relatively distant from the New Purchase. Apparently finding 42 is not only inaccurate but is without any particular significance.

In finding 43 the Commission notes that the defendant's appraiser stated that in 1818 the white population of Indiana was centered in the southern third of the state. In view of the fact that the northern two-thirds of the state of Indiana was still owned and occupied by Indian tribes, this statement is scarcely surprising.

In finding 44 the Commission states that the defendant's appraiser evaluated the New Purchase as worth in 1818 20¢ an acre and that 25 percent of the total acreage was not saleable at all. In view of an earlier finding by the Commission that over 90 percent of the entire area was actually sold by the Government itself for no less than $1.25 an acre in the 20 years subsequent to 1818, this finding appears to be merely a statement of what the Government's appraiser's opinion was and not a finding of fact on the saleability of the land in the New Purchase.

Finding 46 is the ultimate finding of the Commission on value, objected to by both parties to the suit on the ground that nothing in the previous findings can be found to indicate a clue as to the 75¢ per acre found by the Commission as the value of land in the New Purchase on October 6, 1818.

In its opinion on the issue of valuation and unconscionable consideration, the Commission stated what the evidence of the parties consisted of and reviewed the contents of its findings briefly, emphasizing the fact that the lands in adjacent areas to the land in suit had been disposed of at a rate and at prices sufficient to indicate that in 1818 the Government should have anticipated a ready sale of the land in the New Purchase for the then minimum price for public lands of $2 an acre, such land being more desirable and accessible than the adjacent lands already largely disposed of by the Government. The Commission also discussed the reports of the claimant's expert appraiser and the Government's appraiser. It rejected the conclusions on value of the tract in suit reached by the claimant Indians' appraiser without giving any reason. It also rejected the conclusions of the defendant's appraiser because it felt the evidence did not support the assumptions indulged in, in particular the assumption that the land would not sell for the minimum price of $1.25 as an average, and that 25 percent of the land was unsalable. Although the Commission did not comment on two theories

urged by the Government, i. e., the whole-sale value of the land and the necessity of discounting any market value found in 1818 by 6% for the length of time the land remained unsold in the hands of the Government, the Commission appears to have rejected both theories.[6]

In conclusion, the Commission stated that, on the basis of its findings of fact, and in view of (1) the large amount of public land available for sale in the United States, (2) the population of the United States as a whole, (3) the economic conditions prevailing throughout the country during the period involved, it concluded that the land in the New Purchase was worth 75 cents per acre on October 6, 1818. If we give to these reasons the content which they would have to be given to support the conclusion, the reasons are not supported by the evidence, nor by the Commission's findings. The Commission has found that the settlers in Indiana in 1818 were well able to pay cash for their land; that their ability to buy the land was unaffected by adverse economic conditions in the country in 1818 and thereafter, and that there were practically no defaults or resorts to relief provisions such as the Graduation Act; that despite the large amount of public land available for sale in the United States generally, there was a lively demand for the land available in Indiana, and that large tracts of comparable land had been disposed of by the Government at $2 an acre on public sale, for more at auctions and on sales of reserve sections, and for even more on private sales between settlers. We are accordingly at a loss to understand why the Commission states in its conclusion that the amount of public land available throughout the United States and the economic condition of the country had a seriously adverse bearing on the market value of the land in the New Purchase in 1818.

In view of those findings of fact discussed above which we have found to be supported by substantial evidence, we are of the opinion that the Commission has not given adequate or proper reasons for its conclusion that the land ceded in 1818 was worth 75 cents per acre, as it is required to do by Section 19 of the In-

6. The only basis on which a wholesale value of the land might be estimated was the prices paid by the land speculating companies in the 18th century, long prior to the 1818 cession. As found by the Commission, the companies were mismanaged and went bankrupt. The methods they employed, including fraud, caused them to be held in great disfavor by the Government and the public and any application of their standards to the Government in the purchase of Indian lands is unthinkable. Furthermore, in 1818 there were in Indiana a large group of willing and able purchasers who were responsible farmers. These settlers could and did buy the 80-acre tracts made available to them in 1820. While it is true that the large tract ceded could not have been sold to individual purchasers all at once, it was the Government which decided to acquire this large tract at one time and to hold it until disposed of in small tracts to settlers.

Because the land acquired in 1818 was not all disposed of for more than 20 years after its acquisition, there is some notion that the fair market value in 1818 should be discounted at 6 percent for the period held before sale in order to deter-mine the fair market value in 1818. Under the circumstances of this case, such a theory seems untenable. The Miamis had asked for permission in 1809 to sell their land directly to settlers when the Government's minimum price was $2 per acre. Permission was refused. In 1809 and thereafter settlers in Indiana wanted this land and had the money to pay for it. Furthermore, the Miamis were not paid the actual fair market value of their land in 1818 or at any future time so that they, the owners of the land in 1818, never got any amount respresenting the fair market value which they could have invested at 6 percent. Discounting the fair market value in 1818 at 6 percent for the period it took to dispose of the land is, in effect, charging the Indians interest on a fair market value they did not receive and giving the Government interest on money it did not part with for land which it got. In 1818 the Indians parted with their land and got no money. The Government got the land and parted with no money. If the Indians had been allowed to keep the land and sell it themselves, it would not have cost them anything to hold it.

dian Claims Commission Act. Furthermore, we hold that those same findings, findings 6 through 31, do not support the Commission's ultimate finding of value. In addition, as noted earlier herein, certain of the Commission's findings following finding 31 are not findings at all, but are merely recitations of evidence, other findings have no bearing on the issues for decision, and still others are not supported by substantial evidence and are contradictory to earlier findings which are supported by substantial evidence. Finally, the record contains some material evidence which has not been made the subject of any findings. For these reasons the Commission's findings and determination on the issue of the value of the land in suit as of October 6, 1818, will be remanded to the Commission for further consideration and further proceedings, if necessary, consistent with this opinion.

### Offsets and Deductions for Payments on the Claim

In a separate proceeding to determine the amount of allowable offsets and deductions, the Commission made findings of fact and concluded that there should be allowed as an offset $7,257.33 representing gratuitous expenditures made by the United States for the benefit of the claimant tribe, and that there should be deducted from any award as a payment on the claim [7] the sum of $280,500 representing the commuted or capitalized value of the Government's obligations to the tribe under the Treaty of October 6, 1818. The Government has appealed from the Commission's determination relative to the deduction of the latter sum on the ground that such sum does not include additional amounts actually paid to the tribe under the terms of the treaty.

■ The claim sued on herein is one for unconscionable consideration alleged to have been paid by the United States to the claimant tribe for 4,291,500 acres of land ceded by the tribe to the United States pursuant to the Treaty of October 6, 1818, and the measure of the tribe's recovery is the difference between the true market value of the land ceded at the time of cession and the consideration paid for such land by the Government, less offsets for gratuities and less any payments the United States may have made "on the claim". At first blush this appears a simple enough formula but, unfortunately, that is not always the case. For example, although an easily determinable consideration may be stated in the treaty, the Government may actually pay less than that amount and it is the amount actually paid which represents the consideration. Furthermore, all payments made in fulfillment of treaty obligations may not be payments of part of the consideration and not payments "on the claim".

■ In the instant case the Treaty of October 6, 1818, provided that in consideration of the cession by the tribe the United States should pay to the tribe a so-called perpetual annuity of $15,000 in silver; that it would construct a gristmill and a sawmill; that it would provide a blacksmith and a gunsmith (later changed to a miller); that it would provide implements of agriculture and that it would furnish annually 160 bushels of salt. Early in the proceedings in this litigation the parties stipulated that these considerations had a capitalized or funded value of $280,500 made up of $250,000 which was the capitalized value of the annuity of $15,000, such annuity being 6 percent of $250,000, and $30,500 representing the funded value of the other services and goods actually rendered to the tribe under the treaty. Pursuant to this stipulation of the parties $280,500 was used as the consideration or purchase price agreed to and actually paid to the tribe for the land ceded and it was on the basis of this amount that the Commission found that the United

---

7. Section 2 of the Indian Claims Commission Act provides with respect to deductions from a final award of the Commission:

"In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim * * *."

States had paid approximately 6.4 cents an acre for the land ceded and then determined that, in comparison with the market value of the land in 1818, this consideration of 6.4 cents per acre was unconscionably low. In an amended answer filed some four years after making the above mentioned stipulation regarding the value of the 1818 treaty consideration, and after the Commission had rendered its determination on value and had concluded therein that, on the basis of the stipulated treaty consideration of 6.4 cents per acre the Indians had received an unconscionable consideration, the defendant filed an amended answer in which it stated that the consideration of $280,500 stipulated to was not intended by the United States to represent the amount which the United States had paid "on the claim" and that it was claiming as a deduction for payment on the claims not only the treaty consideration of $280,500 referred to in the stipulation but also all of the annual payments of $15,000 made between 1818 and 1854 when, under the Treaty of June 5, 1854, 10 Stat. 1093, the 1818 annuity (and all others) were terminated and commuted and the tribe was paid the funded value of such annuity. The total amount now claimed by the defendant as a payment on the claim is $841,820.89. The Commission was of the opinion that the sum stipulated by the parties as the consideration actually paid for the land, i. e., $280,-500, was also the only payment made by the United States which fell within the meaning of the phrase "payment on the claim" in section 2 of the Indian Claims Commission Act, and that the additional payments which the Government now seeks to have deducted from the final award were something other than payments on the claim. We are of the opinion that the Commission has reached the correct result.

It appears to be the Government's position that treaty consideration and payments on the claim under the same treaty will not necessarily be the same amount and that where consideration for a cession is stated in terms of an annuity, the treaty consideration or purchase price is not the capitalized value of that annuity but all actual payments of such annuity are payments on the claim and are deductible from the final award, citing Quapaw Tribe of Indians v. United Staes, 1 Ind. Cls. Comm. 644, 652, affirmed in part and reversed in part, 120 F.Supp. 283, 128 Ct.Cl. 45. In that case the Commission and this court allowed a limited annuity ($1,000 a year for 11 years) to the extent that it was actually paid ($7,450) as a deduction for payments on the claim arising under the 1824 treaty of cession. We note that in that case the sum representing the annuities actually paid was also treated as part of the treaty consideration for the ceded land in the determination of the Commission that the consideration paid was unconscionable. The parties in the Quapaw case had agreed that the $7,450 actually paid by the Government under the annuity provision of the treaty represented part of the treaty consideration and was deductible as a payment on the claim and there was, accordingly, no discussion in the briefs or the opinions concerning the nature of such payments. We are of the opinion, however, that such payments on account of a limited annuity were probably installments of a stated purchase price and as such, to the extent actually paid, represented the consideration for the cession and payments on the claim.

In the instant case we do not have a provision for a limited annuity but rather a provision for a perpetual annuity. In such a situation, if all payments made thereunder are to be considered as payments on the claim and the annuity actually continues in perpetuity, no claim for unconscionable consideration could ever arise under such a treaty since ultimately the tribe would receive far more than the fair market value of the land ceded although the annual payments agreed to by the United States might be so small that they would be entirely inadequate to meet the annual needs of the tribe involved.

Aside from the fact that the record herein indicates that the United States

did not intend the 1818 annuity to be a perpetual annuity,[8] we are of the opinion that the Government considered only the capitalized value of that annuity to represent the purchase price or consideration for the land it acquired under the 1818 treaty and the annual payments of $15,000 were treated as payments of interest on such capitalized value to be made until the United States should pay the principal amount producing such interest to the tribe. Soon after the 1818 treaty was proclaimed, the United States Treasury set up on its books the sum of $250,000 on which interest at the rate of 6 percent was to be paid to the Miamis in fulfillment of the 1818 treaty obligation to pay $15,000 a year. That the United States considered the principal sum on its books ($250,000) to be the purchase price or consideration for the cession, and the annual payments of $15,000 merely as interest on the principal amount which it retained, is evidenced not only by the book entries, but also by the procedure followed by the Government in an earlier treaty with certain other tribes in this area. In the Treaty of September 29, 1817, 7 Stat. 160, with the Wyandots and six other tribes of Indians, the Government agreed in Article 4 that, in consideration of the cessions made in the treaty, it would pay to three of the tribes "annually and forever" certain stated amounts. In a Report of a Senate Committee on Public Lands, dated December 29, 1817, it was reported that the consideration paid to these tribes for the land ceded in 1817 was 3 cents 8 mills per acre and this amount was arrived at by using in the computation the "present worth of the annuity", i. e., a principal sum which at 6 percent would produce the annual sum stated in the treaty.

We are of the opinion that because of the manner in which the Government chose to discharge its obligation to pay the so-called permanent annuity to the claimant tribe, it viewed this obligation as identical with that created in treaties which provided that the named consideration for a cession should be held in trust or invested in securities and the interest or dividends thereon paid to the tribe with the Government having the use of the money until the principal amount was paid. As in such situations, only the principal amount is the consideration and that consideration is not paid nor is there any payment on the claim until that principal sum is given to the Indians. In the instant case no consideration represented by the annuity was paid and no payment was made upon the claim for such consideration until 1854 when the annuity was commuted and the commuted value was paid to the tribe.

We conclude that the purchase price for the land ceded in 1818 was the capitalized or funded value of the 1818 annuity plus the funded value of the goods and services, actually paid to the tribe as a result of the 1854 treaty, in the total amount of $280,500.00 and that only that amount is deductible from the final judgment as a "payment on the claim". Accordingly, we affirm the Commission's findings and determination on the question of offsets and deductions for payments on the claim.

## CONCLUSION

In summary we hold that the Commission was correct in determining that the claimant Indians held the land ceded to the United States on October 6, 1818, by recognized Indian title and did not therefore have to prove aboriginal use and occupancy of the area so ceded, and the Commission's determination on this issue is affirmed. On the issue of the value of the land ceded in 1818 by the Miamis, we are of the opinion that the ultimate finding of value is not supported by the primary findings made by the Commission and that the case must be remanded to the Commission for further proceedings and correction of both primary and ultimate findings on the ques-

8. See Treaty of October 23, 1826, 7 Stat. 300, Article 4, and the report of the treaty commissioner, dated October 23, 1826 concerning the modification of the annuity provisions of earlier treaties including the Treaty of October 6, 1818.

tion of value. On the matter of offsets we are of the opinion that the Commission has reached the correct result and its determination thereon is affirmed. The final judgment is vacated and the cause remanded to the Commission for reconsideration on the question of value in accordance with this opinion.

WILBUR K. MILLER, Circuit Judge, sitting by designation, and LARAMORE, Judge, concur.

JONES, Chief Judge (dissenting).

I think there is substantial evidence to support the findings of the Indian Claims Commission that the lands involved in this case had a fair market value on October 6, 1818, of 75 cents per acre. This value is amply supported by the record made before the Commission. The summation made by the Commission in its concluding findings with respect to value, while not in great detail is fully sufficient to support that determination.

The witness Paul Starrett is the one witness who had made a thorough study of this entire subject of values as shown by the records in this particular area and other areas in which he had served. He has spent many years in appraisal and sale of lands, and since 1934 has had his business headquarters in Indianapolis, Indiana. Before that he had done a great deal of work in connection with appraisals for large business projects and had made appraisals of properties for many corporations in the Middle West. He has had his business headquarters in Indianapolis continuously since the beginning of 1935. He has done appraisal work for the American Can Company, Chrysler Corporation, Shell Oil, and other large concerns. He is a member of the American Institute of Real Estate Appraisers, and at the time his testimony was taken he was president of the Indiana chapter of that organization. He was a witness for the cross-appellant, who is also appellee. He made a search of the records and made an appraisal of the fair market value of the subject project as of October 1818.

Mr. Starrett made a thorough examination of the records which is the only way values as they existed 140 years ago may be determined. He examined The Handbook of Indiana Geology published by the Department of Conservation. One of the authors of that publication had published a book on the economic geography of Indiana. This book was published by Appleton Company in 1823, and was prepared by Steven A. Visher, who was a professor of geography for Indiana University.

The records which he examined showed that Congress was disturbed by the fact that large tracts in the undeveloped sections of the country had been sold for a few cents per acre. Some speculative concerns had purchased and resold western lands for huge profits.

A large part of the Northwest Territory was beginning to be developed. Indiana was admitted to the Union as a State in 1816; Illinois in 1818; Ohio in 1803, and Michigan in 1837. In the controversy as to the best method of disposing of these vast properties and manifestly for the purpose of avoiding speculation, Congress fixed a minimum price of $2 per acre, which was later reduced to $1.25. In many parts of the northwest area the price for sales in small tracts was approximately double the price that could be obtained when larger tracts were sold. Sales in small tracts would have to be surveyed, records kept, and many details given attention.

Mr. Starrett, after a thorough analysis of the records, found that a considerable portion of the tract in question had to be drained, and while at the present time it is one of the most productive parts of the country, at that time much of it was not then suitable for immediate settlement. There was little means of transportation, few supply stations and much of the area was inaccessible. In fact, he quotes from the 14th Census of the United States made in 1820 and cites from that census report analytical tables

which designate "Approximate Location and Area of Operating Drainage Enterprises, State of Indiana." The report had much other data as to conditions in the different parts of the Nation.

As early as 1790, Alexander Hamilton had told of the conflict of pressure interests between the desire to secure public revenue and the problem of providing homes for settlers in the then undeveloped areas of the new country. As early as 1795 the problem of the speculator was sought to be eliminated when the price of public lands in various undeveloped areas was raised to $2 per acre. These conflicts of pressure interests as between the maximum revenue and interest of the settlers were as of 1818 still undetermined. While a number of tracts were sold at $2 or more, the sales were less in 1818 than they had been in 1817, and during the next few years considerable difficulty was had in collections and there were numerous forfeitures. Many of the sales at the higher prices were of selected tracts.

After considering the numerous records, the maps, the books, the histories and the census reports, Mr. Starrett found that the value of the 7,000,000 acres taken as a whole was as of October 6, 1818, 20 cents per acre.

Since we are permitted to reverse a finding of the Commission on the question of value only if it is not supported by substantial evidence, it seems to me that in the light of the testimony of the only witness who was an experienced appraiser and who had thoroughly examined the record, we have no escape from the conclusion that the Commission's finding of value was supported by substantial evidence.

Apparently the majority opinion does not question the fact that there was substantial evidence to support the Commission's finding of value. Rather it

takes the position that the Commission did not make a proper finding on this issue. Again I disagree. Findings 44 and 46 constitute a clear finding on this subject. Evidentiary findings support these ultimate findings. The Commission had the evidence of the various witnesses before it and decided in finding 46 the value per acre as of the date of transfer and cession.

The experienced witness offered by appellant fixed the value as of that date as $1.87 per acre. In comparing the conflicting evidence of value offered by the parties, the Indian Claims Commission concluded that the land involved in the case had a fair market value on October 6, 1818, of $0.75 per acre. There was certainly substantial evidence to support the Commission's finding of value.

Since the case is to be returned to the Commission, as the majority opinion directs, I think the entire case should be gone into again, including the question of title[9] as well as of value. The entire case should be reopened so that the nature of the appellant's beneficial interest in, as well as the extent of the use of all the land in question could be explored by the Commission in any reexamination of the value of the land.

There were only 1,000 of the Miami Tribe of Indians in scattered groups in this area in 1818. There are 4,291,500 acres of land involved. There is no showing as to how often the Indians used the vast stretches of this great area. They only occupied a very small portion of it.

The later cases both of the Supreme Court and this court are to the effect that only where there is a grant by treaty or act of Congress a definite or definable tract or tracts for exclusive use may there be what is termed "Recognized Indian title" without proof of use and occupancy. I have been unable to find within the four corners of the Treaty

9. This is especially true in the light of the Indian Claims Commission's subsequent decision in a later case of the Miami Tribe of Indians v. United States (No. 253), 5 Ind.Cls.Comm. 180 (1957), in which a construction of the same treaties was involved.

of 1818 anything that approaches such a description, either by express language or by reference to any other treaty or act that would meet that test. Such vague terms as lands "watered by the Wabash" or "by the White River" are wholly insufficient.

The maze of earlier treaties that refer also to other tribes furnish little information as to definite boundaries of tracts granted to the Miami Tribe of Indians or as to areas given them for exclusive use; and no information whatever as to the extent of actual use or occupancy by such tribes.

In the absence of such definite boundaries and exclusive use, proof must be made of use and occupancy.

This court should not find "Recognized Indian title" where the tract is not a defined or definable area that is set apart by a treaty or act of Congress for the exclusive use or occupancy of the claimant tribe or tribes. There is no sufficient proof of "Recognized Indian title" and there is no evidence in the record of actual and exclusive use and occupancy by claimants of the area and little, if any, proof as to the amount and frequency of the use of great portions of the area in question.

The Indian Claims Commission heard extensive evidence, examined numerous documents, and examined many exhibits, some of which were conflicting. I think it would be tragic to affirm the major and most disputed issue in the case, that is the question of recognized title to this vast area, when there is little evidence of the use of the area or any substantial part thereof and at the same time reverse the action on the question of value upon which latter question there was certainly substantial evidence.

As the case is to be returned to the Indian Claims Commission I trust that the Commission will go fully into both of these issues so that a complete record may be made before final action is taken on these important questions.

I have not the slightest doubt that the Indians are entitled to recover on the basis of the actual value of their right to occupy and use of part of the 4,291,500 acres in question, which they actually used and occupied. The extent of that use should have a bearing on the value of the beneficial interest of the Indians in the area in question.

WHITAKER, Judge, joins in the foregoing dissenting opinion.