Per Curiam :
The Indian Claims Commission held that the Peoria Tribe (suing on behalf of the Wea Nation) (Docket No. 314-C) and the Kickapoo Tribes of Kansas and Oklahoma (Docket No. 317) had recognized title to Boyce Areas 73 and 74 (in western Indiana and eastern Illinois) when those tracts were ceded to the United States in 1809 and 1818. 10 Ind. Cl. Comm. 279 (March 2, 1962) ,[1] The Commission later determined that the two groups (Weas and Kickapoos) each had an undivided one-half interest in these areas (Order of March 10,1964). Before any determination of the value of the lands at the time of cession, the United States took an interlocutory appeal to this court, attacking both the ruling of recognized title and the finding of an undivided one-half interest in each petitioner. We affirm.
Areas 73 and 74 lay on the Indian side of the region covered by the Treaty of Greenville of August 3,1795,7 Stat. 49, which set a general boundary line between the territory of the United States and the lands of the signatory tribes in the then Northwest Territory. The Indians ceded their claims to the territory east and south of that line; the Federal Government gave up, in consideration, all claims to Indian lands (with exceptions) north of the Ohio Elver, east of the Mississippi, and west and south of the Great Lakes and the waters uniting them. In Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 175 F. Supp. 926 (1959), the court, upholding the Commission (2 Ind. Cl. Comm. 617, 645, Docket Nos. 67 and 124), decided that the Treaty of Green- *553 ville, together with its “follow up” agreements, granted recognition of the legal right and title of the signatory tribes to the lands relinquished by the United States. See Sac and Fox Tribe v. United States, 161 Ct. Cl. 189, 194-95, 315 F. 2d 896, 898-99 (1963), cert. denied, 375 U.S. 921. Both the Weas and the Kickapoos signed the Greenville treaty. The Commission reiterated its conclusion that the Greenville signatories possessed recognized title in Miami Tribe of Oklahoma v. United States, 5 Ind. Cl. Comm. 180 (Docket No. 253) (1957).
Appellant urges that these prior rulings did not embrace signatory Indian tribes which were not occupying, in 1795, areas within the treaty limits, and that the claimant tribes did not then live in Areas 73 and 74. Appellees insist that the earlier decisions bar the Government, under the doctrine of collateral estoppel, from litigating that issue now. It is unnecessary for us to consider whether the appellant is so estopped because we agree with the Commission and the ap-pellees that, even if the question is technically open, the principles of the earlier rulings, correctly applied in the light of the present record, lead convincingly to the conclusion that the appellee-tribes did have recognized title. Before the cession of 1809 a number of treaties had ensued upon the Treaty of Greenville. One was the Treaty of Grouseland, August 21, 1805,7 Stat. 91-92, which provided in Article IY:
As the tribes which are now called the Miamis, Eel River, and Weas, were formerly and still consider themselves as one nation, and as they have determined that neither of these tribes shall dispose of any part of the coimtry which they hold in common; in order to quiet their minds on that head, the United States do hereby engage to consider them as joint owners of all the coim-try on the Wabash and its waters, above the Vincennes tract, and which has not been ceded to the United States, by this or any former treaty; and they do farther engage that they will not purchase any part of the said country without the consent of each of the said tribes. Provided always, That nothing in this section contained, shall in any manner weaken or destroy any claim which the Kickapoos, who are not represented at this treaty, may have to the country they now occupy on the Vermillion river. [Emphasis added.]
*554 Areas 73 and 74 were admittedly included in “all the country on the Wabash and its waters, above the Vincennes tract, and which has not been ceded to the United States, by this or any former treaty”; also, the country occupied by the Kickapoos “on the Vermillion river” included at least part of these Areas. By its terms this treaty-article was a clear recognition — if recognition had not already been granted by the Treaty of Greenville — that the Weas held and owned Areas 73 and 74 (together with others). (As the Commission found, thereafter the Weas, Miamis and Eel Rivers partitioned the territory so that the Weas acquired separate title to the region involved in this proceeding.) Appellant answers that all that the United States recognized was the existence of the Weas, Miamis, and Eel Rivers as “one nation”, but the treaty language is much broader and plainly recognizes title to and ownership of the designated lands. There is nothing in the treaty background to overturn this reading. As for the Kickapoos, the proviso, in its full context, was more than an acknowledgment of the mere existence Of their claim; the parties obviously intended to preserve the Kickapoos on the same plane as the signatory Indians; since the latter were accorded recognized title, the former had it too. The fact that the Kickapoos did not sign the Grouseland Treaty is .immaterial in this instance; the signatories on both sides (especially the Federal Government) were acting on their behalf and in their interest, unlike the situation in Sac and Fox Tribe, supra, 161 Ct. Cl. at 195-96, 315 F. 2d at 899-900. Nor is it critical whether the Weas and the Kickapoos were or were not occupying Areas 73 and 74 in 1795 or 1805 (though it does plainly appear that at the latter time, at least, they were living in and using the areas). “The lands which Indians hold by recognized title may be lands formerly held by them under mere aboriginal use and occupancy title or may be lands which they never previously occupied and which the Government conveyed or granted to them.” Miami Tribe of Oklahoma, supra, 146 Ct. Cl. at 445, 175 F. Supp. at 939-40. On the whole record it is clear to us that by the Treaty of Grouseland, if not before, Congress recognized or confirmed title in both appellees to the land in dispute. See Minnesota *555 Chippewa Tribe v. United States, 161 Ct. Cl. 258, 262, 267, 269, 315 F. 2d 906, 908, 911, 912 (1963).
At the end of its opinion declaring that the appellees had recognized title, the Commission noted that “in view of the record it will be necessary for farther proceedings to determine the areas within Noyce 73 and 74 which each tribe possessed.” [2] Thereafter the Indians informed the Commission that they could produce no further evidence bearing on the division of the territory and suggested that, because of the impossibility of establishing separate segments for each petitioner, the Commission find that the parties had undivided one-half interests. The Government did not argue that further pertinent evidence could be introduced but contended, among other things, that no award could be made at all unless there was proof of the lands occupied by each petitioner. We think that, in the circumstances, the Commission’s determination to accept the tribes’ suggestion was fully within its discretion. No evidence was available to mark off the respective areas within Noyce 73 and 74. Unless the award was to fail utterly because of the unavailability of such proof, the United States would have no interest in any particular division ; the total amount to be paid would be the same, however the two tribes divided it.[3] And it cannot be the law that the entire award must fall simply because, although it is known that both tribes owned (and occupied) the ceded territory at or about the times of cession, there is now no way to prove which tribe held which part of the whole. Joint ownership or occupancy by friendly tribes has been acknowledged as possible (see the Treaty of Grouseland, supra; Sac and Fox Tribe, supra, 161 Ct. Cl. at 202 (fn. 11), 315 F. 2d at 903), and equal division has been utilized for offsets in comparable *556 situations (see, e.g., Peoria Tribe of Indians of Oklahoma v. United States, 169 Ct. Cl. 1009, 1010-11 (1965); 7 Stat. 410, Art. II (1832)). There is no ground for refusing to apply tbe same formula here. The parties most interested, the Indian tribes, offered this solution as the “only practicable division” and remain agreeable to it.[4]
The determination of the Indian Claims Commission is

Affirmed.

 The two dockets liad been consolidated by tbe Commission for tbe purpose of determining whether tbe petitioners (or tbeir predecessors) bad compensable interests in tbe land.

 The Commission’s interlocutory order of the same date provided that “the petitioners shall now offer proof of their respective interests as to those lands within Royce Areas 73 and 74 which each tribe possessed by virtue of the right of exclusive permanent occupancy conferred by the Treaty of 1795.”

 In its brief to the Commission on the issue of division (subsequently struck by the Commission, see fn. 4, infra) the Government stated (p. 35) that, if the Commission by its original finding and order on title “is committed to the proposition that, regardless of the true facts, the petitioning tribes are entitled among themselves to the entire ownership of Royce Areas 73 and 74 upon the basis of recognition, the defendant has no place or function in this phase of these proceedings. It is solely an issue between the petitioners and the Commission as to the division of the acreage.”

 Appellant also complains of the Commission’s order of March 10, 1904, striking the Government’s objections to the appellees’ supplemental findings and brief (in which they put forth the equal division) and the Government’s own requested supplemental findings and brief. The stricken materials were, in large part, an untimely petition to the Commission (filed without leave) to rehear and redetermine its basic determination that the appellees had recognized title to, and were to be compensated for, Royce 73 and 74. Insofar as the stricken materials bear directly on the division of interest between the tribes — the issue which was still open before the Commission — we have considered the few pertinent parts (the document is physically in the record). The Commission did not adopt most of appellees’ proposed supplemental findings — to which appellant objected.