Cowen, Chief Judge,
delivered the opinion of the court:
Appellees, designated the Emigrant New York Indians, are descendants of a group of Indians who moved from New York to Wisconsin following the signing of a treaty, on September 23, 1822, with the Menominee Tribe of Wisconsin for the purchase of a large tract of land in the vicinity of Green Bay. In 1831 and 1832, the Menominee tribe, by treaties with the Government, ceded a large portion of their lands to the United States (including the tract sold to the ancestors of appellees in 1822), and a reserve of 569,120 acres was set aside by the Government for the exclusive use of all New York Indians.[1] Appellees’ ancestors were not a party to the 1831 and 1832 treaties, which greatly reduced *268 the extent of the holdings which they had purchased in 1822, and although they objected to the transactions in vehement terms, they were eventually compelled to accept them in order to avoid confiscation of all their lands.
Appellees petitioned the Indian Claims Commission for recovery of the value of the interest which their ancestors purchased from the Menominees under the 1822 treaty (a one-half interest in approximately four million acres) and which the United States subsequently acquired from their grantors as a result of the 1831 and 1832 agreements. The Commission, in an opinion of November 1,1957, decided that the United States had unjustly deprived the New York Indians of a legal and compensable interest in the subject lands and that the Government’s actions in dealing with the Indians were less than fair and honorable. 5 Ind. Cl. Comm. 560. On October 8, 1962, the Commission granted the ap-pellees an award of $1,488,629.60 (exclusive of offsets)— representing a gross amount of $1,603,600, the value of a one-half interest in 4,009,000 acres as of June 25, 1832,[2] less the sum of $114,970.40, the value of that portion of land received from the United States in 1832 in exchange, or in consideration, for the relinquishment of the claims of the New York Indians to the greater area. 11 Ind. Cl. Comm. 336. The amount awarded was corrected by an interlocutory order of the Commission, on August 11,1964, to $1,452,-824. 13 Ind. Cl. Comm. 560. On the same day the Commission determined that the United States was entitled to the sum of $139,351.35 for offsets under Section 2 of the Indian Claims Commission Act, and appellees were granted a final judgment of $1,313,472.65. Both parties appeal from the final determination of the Commission. The Government contends that the Commission should be reversed on the issue of liability, while the Indians take exception to the amount of damages awarded.
*269 The Goyernment does not take specific exceptions to the evidentiary findings of fact of the Commission on the matter ■of liability, although it questions them in its brief and points out that most of them were derived in large measure from the requested findings of appellees. It argues that the Commission failed to give attentive consideration to the evidence and to make careful and unbiased findings of its own. We have reviewed the findings of the Commission, however, and hold that each is supported by substantial evidence in the record. The findings are therefore conclusive under the provisions of the Indian Claims Commission Act, 25 U.S.C. § 70s; Sac and Fox Tribe of Indians of Oklahoma v. United States, 161 Ct. Cl. 189, 315 F. 2d 896 (1963), cert. denied, 375 U.S. 921; Sac and Fox Tribe of Indians of Oklahoma v. United States, 159 Ct. Cl. 247 (1962); Yakima Tribe v. United States, 158 Ct. Cl. 672 (1962). The Government’s major disagreement with the Commission concerns the conclusions of fact and law which it drew from the primary findings of fact. We find that the ultimate conclusions of fact are amply supported by the evidence as a whole and that the conclusions of law are correct. The pertinent evidence and conclusions are hereinafter discussed.
The Indians involved in the events which have given rise to the present litigation were comprised of several different tribes and organizations. Chief among them were the Six Nations of the Iroquois Confederacy,[3] the most powerful and influential Indian grouping in the northeast. Also present within the borders of New York State and concerned with the transactions here in issue, were the Brotherton, Stockbridge-Munsee, and St. Begis Nations. The Indians named often acted as independent tribes, but were on occasion capable of acting in concert to achieve objectives of mutual benefit.
As early as 1810 the possibility of a removal from New York was discussed in a council of the Six Nations. In 1815 their sachems and chiefs petitioned President Madison with *270 respect to the desirability of a move, with Government approval, to Ohio or Indiana where they could obtain “from our Western Friends, a seat on their lands.” The petition was motivated by the fact that the New York tribes had found themselves confined to small and detached pieces of land surrounded by white settlers whose customs and pursuits were different from and often in conflict with their own, and because their game was nearly exhausted. On February 12, 1816, William H. Crawford, the Secretary of War (who was by virtue of his office then in charge of Indian Affairs), replied that the President had granted their requests and had agreed to acknowledge their title to such lands as could be obtained from the western tribes. Approval of the course of action proposed by the New York Indians was conditioned, however, upon their acquisition of lands farther west than Ohio, for the Government at the time contemplated extension of the existing line of white settlement beyond that region.
In 1820, representatives of those New York Indians desiring to settle in the west made an exploratory trip to the area around Green Bay, Wisconsin, then part of the Michigan Territory. The expedition was encouraged, assisted, and financed by the United States, which desired as a matter of policy to facilitate the removal of eastern Indians and open their lands to burgeoning white settlement. Secretary of War Calhoun informed the New York Indians that he would allow $300, equipment, and provisions for each of ten persons undertaking the journey and would make rations available at the various military posts that the party would visit. He also advised Governor Lewis Cass of the Michigan Territory that the expedition had the full approval of the President and gave instructions to assist it in attaining its ends. In 1820, while en route to Wisconsin, the members of the expeditionary party learned that much of the land they wished to purchase had recently been sold to a Colonel Bowyer, the Indian Agent at Green Bay. Notably upset at this impediment to their plans, the Indians returned and protested to the Secretary of War, asking ¡him to prevent ratification of the Bowyer purchase. As a result of their petition and a similar request made by Governor Cass, the Secretary of *271 War disapproved the purchase and the matter was never presented to the Senate for ratification.
Representatives of the New York Indians then set out once more for Green Bay with the encouragement and assistance of the United States Government. The Secretary of War again arranged for the furnishing of provisions for the party. The delegation was accompanied by Oharles C. Trowbridge, appointed by Governor Cass to assist the Indians in whatever manner possible. At Green Bay, on August 18, 1821, a treaty was entered into between representatives of the Oneida, Onondaga, and Seneca Nations, on behalf of all the New York Indians, and the chiefs and headmen of the Menominee and Winnebago Indians of Wisconsin. The treaty, which was procured with the aid and under the supervision of officers of the United States, called for the sale of a tract of land containing approximately 804,000 acres of land to the Six Nations, St. Regis, Stockbridge, and Munsee Nations. The Menominees and Winnebagoes reserved to themselves the right to occupy, hunt, and fish the land thus ceded. In consideration of the grant of land, the New York Indians agreed to pay $2,000.
On October 22, 1821, Governor Cass wrote Secretary of War Calhoun, enclosing a copy of the treaty and a full report of the attendant proceedings by Trowbridge. The Governor stated that he considered the concluded negotiations important to the Indians and the United States alike and asserted that the New York Indians would form a barrier which could prove highly useful in the event of future hostilities in that region.
On November 22,1821, Secretary Calhoun informed Chief Hendrick of the Stockbridges that he was pleased at the success of the Green Bay mission and that the treaty met with the full approval of the President, “which is all the ratification that is necessary as only those treaties to which the United States is a party require the addition of the sanction of the Senate.” The treaty was formally approved by President Monroe on February 19,1822.
The New York Indians, however, were not satisfied with their 1821 purchase from the Menominees and Winnebagoes, *272 believing the tract to be too small in size and too distant from Green Bay. Consequently, they asked for permission to obtain an additional cession. On February 13, 1822, the Secretary of War acceded to their wishes and authorized another deputation to negotiate for the purchase of a larger tract. Once again Federal officials and officers of the Michigan Territory were given letters recommending that assistance be accorded to the Indians in accomplishing their objectives. Governor Cass appointed John Sergeant, Jr., to accompany the delegation and to supervise negotiations on behalf of the United States, and instructed him that:
The object in procuring this cession is not only to provide a tract of country sufficient for the residence of these Indians, but also to exclude from it, and from its vicinity, any white settlements.
The advance which these Indians have made in improvement, their education, habits, and association, and the annuities which are due to them, secure their friendship and fidelity to the United States. And they will thus act as an important advance post, in an exposed quarter, where they will be surrounded by doubtful or disaffected Indians. It is important, therefore, that their situation should be as pleasant to themselves as possible. (5 Ind. Cl. Comm. 560, 571.)
On September 23, 1822, a new treaty was concluded at Green Bay between deputies of the New York Indians and the chiefs and headmen of the Menominee Nation, under the supervision of John Sergeant. By this treaty, which was signed in the presence of Sergeant and the officers of the garrison at Ft. Howard, near Green Bay, the Menominees conveyed to the New York Indians a large tract of land comprising approximately 7,480,000 acres. The Menominees were guaranteed “the free permission and privilege of occupying and residing upon the lands herein ceded in common” with the New York Indians, and a consideration of $3,000 in goods was provided. The Indian Claims Commission properly construed the terms of the treaty as entitling the emigrant Indians to an undivided one-half interest in the subject lands — a right of use in common with the Menominees.
*273 At the time of the execution of the treaty, the Menominees owned, in addition to the 7,480,000 acres ceded, a contiguous tract of more than 2,500,000 acres lying to the southwest. The boundaries of both areas were somewhat indefinite, particularly in the north, and were not satisfactorily determined until the Treaties of Prairie du Chien and Butte des Morts in 1825 and 1827, respectively. These boundaries, as ultimately delineated, revealed that the Menominee lands did not in fact extend as far to the north as to the territory described in the 1822 cession to the New York Indians. Making appropriate adjustments to take this fact into account, ap-pellees have limited their claim to approximately four million .acres.
President Monroe approved the treaty on March 13,1823, but limited his consent to 1,557,000 acres of the tract covered, deeming that acreage to be sufficient for the use of the emigrant Indians. Representatives of the Indians immediately protested the qualification in the President’s ratification and requested clarification of the matter from the Secretary of War. On October 27, 1823, Secretary Calhoun advised the chiefs of the New York Indians that the President had altered his position and now had not “the least objection to the arrangement which [had] been entered into between you and the Menominees in its fullest extent.” In his correspondence to the Indian leaders, Calhoun stated:
Brothers, Your great father the President wishes you distinctly to understand, that he does not mean, by the partial sanction which he has, or may give, to the arrangement between you and the Menomenees to interfere with, or in any manner invalidate your title to all the lands which you have thereby acquired, including those not confirmed by the government. On the contrary he considers your title to every part of the country conveyed to you by the Menomenees as equally valid against them, and has no objection to your occupying and using the same, as if the whole had been confirmed by the government. The acquiescence of the government therefore in the arrangement to the whole extent, altho’ it does not think proper to give its special sanction so far, affords sufficient proof that you have not acted without authority, that what you have done has been *274 done with the full assent of the government and that there is nothing which should create dissatisfaction among the Menomenees or your own people to prevent the arrangement as it was originally concluded between you from being carried mutually and faithfully into effect. 5Ind. Cl. Comm. 576.
One month later, Calhoun wrote to Governor Cass, enclosing a copy of the foregoing correspondence with the New York chiefs and informing him that this communication should “remove all further difficulty to the due execution of the treaty referred to in its whole extent, or their parts respectively.”
Relying upon their rights under the 1822 treaty and the assurances given by the President and the Secretary of War, many of the New York Indians sold their eastern lands and repaired to their new Wisconsin domains, bearing themselves the expense of removal. Once settled, they cultivated the land and made improvements upon it. From the start, however, they encountered difficulties, principally from the local French settlers [4] and from the Menominees, who began to regret the bargain they had made.
Eventually, the New York Indians encountered a more powerful antagonist — the United States Government. Government policy, which had encouraged and assisted the efforts of the New York Indians to purchase and settle the land,[5] now slowly and progressively developed along lines unfavorable to them. Under the Treaty of Prairie du Chien, on August 19, 1825, 7 Stat. 272, the Government attempted to fix boundaries to the lands claimed by the various tribes residing in Wisconsin. Although the Menominee boundaries were not completely defined by the treaty, general dimensions *275 were listed. Article 11 of the instrument noted that it would be necessary to complete the boundary lines and make a final adjustment of the rights and claims of the respective tribes at a later date.
Such was accomplished on August 11,1827, by the Treaty of Butte des Morts, 7 Stat. 303, between the United States and the various native Wisconsin tribes. The treaty further defined the borders of the lands allotted to each Indian entity. The New York Indians were not a party to either the Treaty of Prairie du Chien or the Treaty of Butte des Morts, although their rights were necessarily affected by the provisions of each. Article 2 of the latter agreement recognized the existence of difficulties between the New York Indians and the Menominees and Winnebagoes and provided that:
It is agreed by the Menominies and Winnebagoes, that so far as respects their interest in the premises, the whole matter shall be referred to the President of the United States, whose decision shall be final. And the President is authorized, on their parts, to establish such boundaries between them and tne New York Indians as he may consider equitable and just.
By 1827, Government policy had shifted in a manner decidedly adverse to the emigrant Indians. Governor Cass and the Commissioner of Indian Affairs, Colonel Thomas C. McKenney, faced with problems created by conflicting Indian claims, now asserted that the United States was “free to take any course” it deemed proper regarding the rights of the New York Indians, on the ground that the 1822 treaty had never been fully ratified by the President. These *276 officials propounded the view that President Monroe’s approval of that agreement had been conditional and that the Indians had failed to complete the requisite acts of acceptance. The intent of this change in policy was that the New York Indians, as a farming people, should be restricted to a small area of land and that their valuable and extensive holdings should be put at the disposal of the Federal Government.
The New York Indians protested once more to the Government, complaining that their lands had been diminished without their consent and maintaining that they would never have emigrated if they had known beforehand of the Government’s ultimate intentions. President John Quincy Adams noted their remonstrance and remarked to the Commissioner of Indian Affairs that:
In the instance of the New York Indians removed to Green Bay and of the Cherokees removed to the Territory of Arkansas, we have scarcely given them time to build their wigwams before we are called upon by our own people to drive them out again. (5 Ind. Cl. Comm. 560, 591)
The 1827 Treaty of Butte des Morts was eventually ratified by the Senate with the following proviso:
The said treaty shall not impair or affect any right or claim which the New York Indians or any of them have to the lands or any of the lands mentioned in the said treaty. (7 Stat. 803, 305)
In view of the difficulties which had arisen over conflicting claims, President Jackson, in 1830, appointed three commissioners to investigate the controversy among the New York Indians and the Menominees and Winnebagoes. The agents were instructed to travel to Wisconsin, to confer with all the tribes concerned and to select, and to set aside a tract of land for the New York Indians. They were specifically ordered to waive any question of the validity of the 1821 and 1822 treaties from which the New York Indians derived their rights. The commissioners, however, were unable to mediate the disputes in a manner satisfactory to the New York Indians ; and failing to achieve an agreement among the tribes, *277 they established ex parte for the emigrants a tract of land comprising approximately 300,000 acres. Although instructed not to decide the question of validity of the purchase treaties, the commissioners did in fact expressly mate a determination that the 1822 treaty was valid.[6]
After the commissioners had concluded their business, it was agreed, on September 1, 1830, that a delegation of Menominees should travel to Washington for further negotiations under the tutelage of one Colonel Stambaugh. Eventually, on February 8,1831, a treaty was concluded between the United States and the Menominees, 7 Stat. 342, divesting the New York Indians of the lands acquired by them in 1822. The Emigrant New York Indians were not a party to the negotiations or the treaty, under which they were granted a 500,000-acre tract as a permanent home for them and for such other New York Indians as might choose to emigrate and settle the area within 3 years. On October 27,1832, a supplemental treaty was signed by the United States and the Menominees, 7 Stat. 405, whereby the New York Indians were awarded an aggregate of 569,120 acres— 500,000 acres as a home for all the New York Indians (emigrants and non-emigrants alike), a township of 46,080 for the use of the Stockbridge and Munsee tribes, and a township of 23,040 acres for the, use of the Brotherton Indians.
As a result of the 1831 and 1832 treaties, the Emigrant New York Indians were left with 569,120 acres, rather than the approximately four million acres which they acquired from the Menominees in 1822. The New York Indians were then informed by Governor Porter of the Michigan Territory that if they did not accept the provisions made for them they would face probable expulsion from all their lands. Under such threats the emigrant Indians acquiesced and finally gave their assent to Stambaugh’s treaties. The Indian Claims Commission properly concluded from the facts that the consent was given under duress.
*278 The Commission held the United States liable to the ap-pellees on the ground that i't failed to carry out the promises it made in inducing and encouraging the New York Indians to sell their eastern lands and move to Wisconsin — “to acknowledge the title to such land as you shall obtain, by grant or otherwise, from your western brethren,” and to respect and protect all lands so obtained and to see that “in treaties to be held hereafter with other tribes, your lands may not be granted away by them.” [7] The Commission determined that by the execution of Stambaugh’s treaties and the ultimate purchase of the disputed territory for its own account, the Government had violated the standards of fair and honorable dealings in excluding the New York Indians from the lands they had acquired in 1822.
We are in agreement with the position taken by appellees and the decision of the Indian Claims Commission supporting it. That position may be succinctly stated as follows: (1) the Menominees had recognized title to all the land in issue here; (2) under a treaty encouraged and approved by the United States, the Menominees, in 1822, transferred a one-half interest in the subject land to the ancestors of appellees, and (3) the New York Indians held the lands in the same manner as the Menominees until the Government effectively extinguished their rights by the Stambaugh treaties of 1831 and 1832 and acquired most of the land for its own use.
By the Treaties of Prairie du Chien and Butte des Morts in 1825 and 1827, and by supplemental treaties, the United States recognized the title of the Menominees to the area in question in this case. Appellees disclaim any interest in land which may have been granted to them under the 1822 treaty by the Menominees but which was not subsequently recognized by the United States as having been Menominee land. In short, the New York Indians assert an interest in only 4,009,000 of the 7,480,000 acres mentioned in the 1822 treaty. The purpose of the 1825 and 1827 treaties was to settle indefinite and conflicting Indian claims to lands in the State of Wisconsin and to delineate and recognize the tracts be *279 longing to each tribe.[8] Supplemental treaties and subsequent cessions by the Menominees to the United States consistently followed the boundaries thus established and recognized in these agreements. In Lower Sioux Indian. Community in Minnesota v. United States, 163 Ct. Cl. 329, 335 (1963), this court analyzed the Treaty of Prairie du Chien and noted that:
We can find nothing in the historical background of the treaty that suggests other than that the intent of the United States, and that of the various Indian tribes assembled, was to carve the entire territory so as to give each tribe title to the lands claimed. It was a treaty of recognition; it defined the country of the respective Indian tribes; it was not a treaty of cession.
See also Beecher v. Wetherby, 95 U.S. 517, 525 (1877); Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 315 F. 2d 906 (1963).
The following language was employed in Article 8 of the treaty:
The representatives of the Menominees not being sufficiently acquainted with their proper boundaries, to settle the same definitely, and some uncertainty existing in consequence of the cession made by that tribe upon Fox Eiver and Green Bay, to the New York Indians, it is agreed between [the various Indian tribes] that the claim of the Menominees to any portion of the land within the boundaries allotted to either of the same shall remain as valid as if this treaty had not been concluded. It is, however, understood that the general claim of the Menominees is bounded on the north by the Chippewa country, on the east by Green Bay and Lake Michigan extending as far south as Milawaukee river, and on the West they claim to Black River. (7 Stat. 272, 274)
In its ratification of the Treaty of Butte des Morts, in 1829, the Senate added the previously mentioned proviso that: “The said treaty shall not impair or affect any right or claim *280 which the New York Indians or any of them have to the lands or any of the lands mentioned in the said treaty.” (7 Stat. 303, 305)
The evidence indicates conclusively that the United States recognized that the Menominees had title to all 4,009,000 acres involved herein and that the New York Indians had acquired rights in the lands so recognized. Those rights derived from the 1822 treaty of purchase from the Menominees, to which treaty the United States gave its sanction and approval. In the first place, the Government encouraged and assisted the New York Indians in making the treaty by financing and aiding the exploratory trips of the Indian representatives to Green Bay and by appointing agents to supervise negotiations with the Menominees.
Secondly, the treaty was approved by President Monroe. Although his sanction was at first limited to a portion, 1,557,-000 acres, of the subject land, the Secretary of War assured the Indians in unequivocal terms that the President’s ratification extended to all the country covered by the 1822 Menominee cession. For a time after execution of the treaty, the United States complied with its promises to the New York Indians to protect them in the possession of the lands acquired, by taking appropriate measures, including military support, against harassment by the Menominees and Winnebagoes and against intermeddling by the local French settlers. At least until 1825, the Government clearly supported the rights of the New York Indians and treated the 1822 treaty as both beneficial and binding.[9] Despite a *281 gradual change of policy on the part of Governor Cass, Commissioner (of Indian Affairs) McKenney, and other officials starting in 1825-1827, there were continuing manifestations by the Government attesting to the validity of the purchase treaty. The Senate affirmed, by its ratification of the Treaty of Butte des Morts, the existence of rights in the disputed areas by the New York Indians. Moreover, the special commissioners appointed by President Jackson in 1830, though instructed to ignore questions pertaining to the validity of the 1822 treaty, stated in their report that the agreement in issue was undoubtedly valid. It is fair to assume, as the Indian Claims Commission did, that the United States recognized the 1822 treaty and regarded it as perfectly valid until some years after its execution when it desired to take the land for itself and thus began to cast doubt upon its legality.
The Government relies strongly upon the contention that the Indian Claims Commission erred in holding that the New York Indians had “original Indian title” to the subject lands. A reading of the Commission’s opinion, however, quite clearly reveals that the decision was not predicated upon a finding of aboriginal title. Although the Commission’s interlocutory orders of November 1 and 12,1957, stated that appellees “held original Indian title on September 23,1822” and June 25,1832, to an undivided one-half interest in a described tract of land, it is quite apparent that defendant’s liability was based on recognized title, and not aboriginal Indian title. In fact, the Commission expressly noted that it was unnecessary for the petitioners to prove aboriginal title. The following statement from the decision should serve to dispel any doubts as to the true basis for the order entered:
The fact that the Menominee title was not recognized until 1825 and the purchase was made by the New York Indians in 1822 cannot affect the title acquired by the New York Indians as against both the Menominees and defendant. It has not been questioned that the title recognized was the same general area which the New York Indians had purchased in 1822. And petitioners limit their claim to the area which was recognized in the Treaty of Prairie du Chien in 1825 and the Treaty of Butte des Morts in 1827 when the Menominee boundaries were finally established. It is a fair assumption *282 that the Menominees had Indian title in 1822 to a certain area of land in Wisconsin, or the defendant would not have recognized their title in the Prairie du Chien Treaty in 1825. Upon the assurance of defendant that it would recognize the title of the Emigrant New York Indians as being the same as that held by their grantors, the Emigrant New York Indians acquired one-half interest in the Indian title had by the Menominees. When defendant refused to honor its promises to the Emigrant New York Indians, while at the same time it recognized the title of the Menominee, it was less than fair to petitioners’ ancestors. The recognition by defendant of title in the Menominees renders it unnecessary for the petitioners to prove aboriginal title, beca/use under the facts the Emigrant New Y orle Indians acguired the recognized title of the Menominees by their purchase under the Treaty of September 28,1822. [Emphasis supplied.] (5 Ind. Cl. Comm. 560,628)
To the extent that the language of the interlocutory orders indicates that appellees had aboriginal title, it is in error and stands corrected to reflect the Commission’s determination that the New York Indians had recognized title to the subject lands as of 1822, the date of purchase, and as of 1832, the date they were deprived of the same by the United States.
In such a case as the one before us, where there has been a recognition or acknowledgment of Indian title by the United States, it is unnecessary to prove title by a clear showing of exclusive aboriginal use and occupancy. United States v. Kickapoo Tribe of Kansas, 174 Ct. Cl. 550 (1966) ; Lower Sioux Community in Minnesota v. United States, supra; Minnesota Chippewa Tribe v. United States, supra; Tee-Hit-Ton Indians v. United States, 348 U.S. 272 (1955).
By the Treaty of Prairie du Chien and supplemental agreements, the Government acknowledged the existing Indian title of the Menominees to a large tract of land in Wisconsin. See Lower Sioux Community in Minnesota v. United States, supra; It must be assumed that the Menomi-nees also possessed the same rights to the lands in 1822, when they ceded an undivided one-half interest in a portion of their holdings to the New York Indians. Since appellees’ ancestors purchased their rights in the Menominees’ land with the full encouragement, assistance, and ratification of the United States, they therefore acquired an acknowledged *283 interest in the recognized title of their grantors. The decision of the Indian Claims Commission is correct and its judgment is affirmed in this regard.
The Government argues that even if the Menominees had Indian title to the lands in question in 1822, they had no authority to convey any of their rights to the New York Indians without the consent of Congress. The contention is based upon several judicial decisions and the Trade and Intercourse Acts of 1790, 1796, 1799, 1802, and 1834; 1 Stat. 137, 469, 743 ; 2 Stat. 139 and 4 Stat. 729 (now 25 U.S.C. § 177). The decisions relied upon stand for the proposition that the United States alone, as sovereign, possesses the power to extinguish Indian title. They do not deal with questions of trade and intercourse among individual tribes, but are concerned rather with questions of trade and intercourse between Indians and the white community. The relevant act, that of 1802, when read in its entirety and in light of the circumstances surrounding its enactment, reveals an intention merely to prevent purchases by white men of Indian title without the sanction of Congress. This interpretation is in accord with the views of responsible Government officials (both at the time of enactment and during the early years of enforcement of the statutes) who considered the acts to be inapplicable to intertribal transactions. Contrary statements of certain Government officials concerned with the events which have produced the present litigation, particularly that made by Secretary of War John W. Eaton to the Senate Indian Affairs Committee in 1831 in urging ratification of Stambaugh’s treaty, to the effect that Senate approval was required to execute the 1822 treaty, are inconsistent with general Government policy throughout the years in question.[10] Considering the fact that these officials de *284 sired to acquire the land in question for the benefit of the United States and white settlement and therefore earnestly-sought to invalidate the treaty of purchase from the Menom-inees, their assertions are hardly surprising.
We need not decide at this point whether the Trade and Intercourse Act can ever be interpreted as applying to sales of Indian lands by one tribe or individual to another, for it is clear in light of the circumstances described above that the Trade and Intercourse Acts did not nullify the transaction before us.[11] Since ratification by the Senate was not required by statute, the 1822 treaty was valid and granted a legal and effective one-half interest in 4,009,000 acres to the New York Indians.
That the New York Indians were more advanced in culture and business acumen than the Menominees and that the purchase treaty resulted in an extremely favorable bargain for them does not destroy their equitable position, as the Government would have us believe. The fact of the matter is that they legally acquired a valid and compensable interest by the agreement. Their claim is against the United States for loss of their lands and not against the Menominees. The record amply supports the conclusion of the Indian Claims Commission that the Government violated the standards of fair and honorable dealings by depriving the New York Indians of their title to the lands in issue.
The Indian Claims Commission fixed the value of appel-lees’ interest in the land in question at $1,603,600, which was based upon a fair and reasonable value of $0.80 per acre as of June 25, 1832. The Indians contend that the value thus determined is insufficient and that the case should be *285 remanded to the Commission to revise its award on the basis of a valuation of not less than $0.95 per acre, or a minimum total of $1,750,000. We are unable to agree with the argument advanced, however, for the record establishes that the Commission applied the proper standards and arrived at a valuation that has substantial support in the evidence.
Appellees are entitled to the fair and reasonable value of the land of which they were deprived. In the absence of comparable sales and an actual market at the time and place in question, this court has regularly taken into consideration various physical and economic factors in determining’ the value of lands acquired by the Government from Indians— elements of value which a willing buyer and seller would likely have considered in reaching an agreed sale price for the claimed area at the time of acquisition. Red Lake, Pembina, and White Earth Bands v. United States, 164 Ct. Cl. 389 (1964); Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 175 F. Supp. 926 (1959); Otoe and Missouria Tribe of Indians v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265 (1955), cert. denied, 350 U.S. 848. That is precisely the approach followed by the Commission in the instant case. Among the criteria considered were: (a) the prevailing economic situation and the condition of the money market; (b) the population level and physical development of the area, along with its general desirability to prospective settlers; (c) the relative ease of accessibility to the area; (d) the effect of the existence of more suitable and marketable land in other areas; (e) the prices paid for land in more settled areas; (f) the prevailing climate within the claimed tract; (g) the fertility of the soil within the area; (h) the existence of various minerals and other natural resources; (i) the existence, location, and extent of timber land within the tract; and (j) the proximity of the land to markets, distribution centers, and transportation facilities. Since the Commission’s finding on value is amply supported by the record, we accept the finding as conclusive under the Indian Claims Commission Act.
From the total valuation of $1,603,600, the Commission deducted the sum of $150,776 as the consideration received by appellees’ ancestors under the terms of the 1832 treaty, *286 including the value of their pro rata share of the land received from the Government in exchange for the relinquishment of their claims under the 1822 treaty. From the subtotal of $1,452,824, the Commission allowed eleven items of offset, representing gratuitous expenditures made by the Government for the benefit of the New York Indians after the date of the treaty of 1832. The offsets allowed a total of $139,351.35, leaving a net award of $1,313,472.65. Ap-pellees attack three of the eleven offsets: (a) $39,831.20, the value of 76.13 percent of the 65,400-acre Oneida Reservation near Green Bay; (b) $65,884.27 expended by the Government for the purchase of land for the Oneidas, and (c) $22,-534.10 spent for the purchase of land for the Stockbridge and Munsee Indians. We have concluded that the Commission correctly allowed the challenged offsets.
Under the 1832 Stambaugh treaty, a 500,000-acre tract was set aside for all the New York Indians (emigrant and non-emigrant), and 69,120 acres were reserved for the use of the emigrant Oneida and Stockbridge-Munsee tribes. The Commission determined that the emigrant Indians comprised 23.87 percent of all the New York Indians and concluded that their pro rata share of the tract reserved for all the Indians was 119,350 acres (500,000 x 23.87 percent). As a result, the Government was given a credit for the 119,350 acres in the amount of $95,480 (at $0.80 per acre), and also a credit of $55,296 for the 69,120 acres given to the Oneida and Stockbridge-Munsee. These amounts were deducted from the Commission’s award as the consideration received by the emigrant Indians in exchange for the relinquishment of their rights in the 4,009,000-acre tract.
In 1838, all the New York Indians (emigrant and non-emigrant) ceded their rights in the 500,000-acre reservation to the Government in exchange for land in Kansas, and 65,400 acres were reserved for those members of the Oneida tribe then residing in Wisconsin. The 65,400-acre tract lay entirely within the 500,000 acres reserved for all the New York Indians under the Stambaugh treaty. Although the 65,400 acres were reserved for the exclusive use of the emigrant Indians, the Commission initially allowed the Government a credit of only 23.87 percent, when it was actually *287 entitled to a credit for the full value of the tract. In its original decision, the Commission should have awarded the Government a credit for the value of 23.87 percent of 434,600 acres (500,000 less 65,400), plus a credit for 100 percent of the value of the 65,400 acres, since the latter tract was for the occupancy of emigrant Indians alone. The error was later corrected by allowing the Government an offset of $39,831.20, representing the value of the remaining 76.13 percent of the 65,400 acres for which the Government was entitled to credit. There was no duplication of deductions as appellees contend, because the net result of the Commission’s computation is the same as if it had followed the more natural sequence of allowing 23.87 percent of the value of 434,600 acres and then 100 percent of the value of 65,400 acres as a separate item.
The Government spent $65,884.27 for the purchase of land for the Oneida Indians, and $22,534.10 for the purchase of land for the Stockbridge and Munsee Indians, pursuant to Section 5 of the Indian Eeorganization Act of 1934 (48 Stat. 984). Appellees argue that since the course of dealings on the part of the Government towards the New York Indians has been found to have been less than fair and honorable, defendant is not entitled to offsets for such expenditures. They contend, alternatively, that even if a deduction is made, the land in question should be valued at the rate of $0.80 per acre prevailing in 1832, rather than the approximately $30 per acre which the Government paid for the land a hundred years later. The Indian Claims Commission rejected both contentions, and we affirm that action. Section 2 of the Indian Claims Commission Act evidences a congressional intent to allow an offset for all amounts actually expended by the Government on behalf of the Indians under Section 5 of the Indian Reorganization Act of 1934, “if the entire course of dealings warrants such action.” See Sioux Tribe v. United States, 161 Ct. Cl. 413, 416-17, 315 F. 2d 378 (1963), cert. denied, 375 U.S. 825. The Government’s actions and its course of dealings with the Indians in 1832 do not prevent it from recovering in good conscience the gratuitous expenditures which it actually made in purchas *288 ing lands for appellees a century later. Congress plainly contemplated the offset of such a claim in the absence of a showing of irregularity or unfairness with respect to the amounts deducted.
For the reasons stated above, the determinations of the Indian Claims Commission as to appellant’s liability, the amount of damages due appellees, and the offsets to which the United States is entitled, are affirmed.

Affirmed

 The Emigrant New York Indians now residing in Wisconsin are organized into two groups, the Oneida Tribe and the Stoekbridge-Munsee Community, and occupy reservations which are the remnants of, or are in lieu of, the 569,120 acres established and reserved to their ancestors pursuant to the treaties of 1831 and 1832.

 In its November 1, 1957, opinion, dealing with the question of liability, the Commission stated that the land in issue comprised approximately 3,931,000 acres. In its opinion of October 8, 1962, wherein it determined the precise extent and the valuation of the land, it found that the area in question contained 4,009,000 acres and had a fair market value of $0.80 per acre. The total value of the land was thus placed at $3,207,200, and appellees’ one-half interest at $1,603,600.

 The Sis Nations were comprised primarily of the Seneca, Cayuga, Onondaga, Oneida, and Tuscarora. The Mohawks, one of the original constituents of the Confederation, are not involved in the present case.

 The French settlers, who had had long and friendly relations with the Menominees, opposed the settlement of the New York Indians, attempted to prevent the purchase, and encouraged the Menominees to harass the emigrants and to frustrate their peaceable enjoyment of the lands purchased. 5 Ind. Cl. Comm. 560, findings 17 and 18.

 The Indian Claims Commission noted that it was the policy of the united States, as early as 1815, to foster and encourage the removal of New York Indians to the Green Bay area, and that this policy continued for more than a decade. Secretary of War Calhoun, on January 24, 1825, recommended the removal of Indian tribes to President Monroe, stating:
“There is another point which appears to be indispensable to be guarded, in order to render the condition of this race less afflicting. One of the greatest evils to which they are subject is that incessant pressure of our population, which forces them from seat to seat, without allowing time for that moral and *275 intellectual improvement, for which they appear to he naturally eminently susceptible. To guard against this evil, so fatal to the race, there ought to be the strongest and most solemn assurance that the country given them should be theirs, as a permanent home for themselves and their posterity, without being disturbed by the encroachment of our citizens.” (5 Ind. Cl. Comm. 560, 578)
On February 3, 1826, Secretary of War Barbour reported to the Indian Affairs Committee of the House on the proposal to remove Eastern Indians to the west, stating:
“The principal recommendation of this plan, next to the advantages to be gained by ourselves, is, that the future residence of these people will be forever undisturbed; that there, at least, they will find a home and a resting-place ; and being exclusively under the control of the United States, and, consequently, free from the rival claims of any of the States, the former may plight its most solemn faith that it shall be theirs forever; and this guaranty is therefore given.” (5 Ind. Cl. Comm. 560, 579)

Tie 1822 treaty had been questioned on two grounds: (1) that all the Menominee chiefs had not joined In Its execution ; and (2) that the Menominees did not intend to sell their lands, but only to permit the Eastern Indians to share in its enjoyment. The commissioners noted that the treaty had been recognized by the whole Menominee Nation and that it never purported to give more than a right of occupancy to the New York Indians in any event.

 Tie language quoted Is taken from the letter of Secretary of War Crawford to the Six Nations on February 12, 1816. (5 Ind. Cl. Comm. 560, 663, 664)

 The preamble to the Treaty of Prairie du Chien states:
“The United States of America have seen with much regret, that wars have for many years been carried on between [the various Wisconsin tribes who were signatories to the treaty]. * * * In order, therefore, to promote peace among these tribes, and to establish boundaries among them » * * and thereby to remove ail causes of future difficulty, the united States have invited [the signatories] * * * to assemble together, and in a spirit of mutual conciliation to accomplish these objects.”

 Colonel Thomas L. McKenney, the Commissioner of Indian Affairs, in a letter of March 1825 to H. B. Brevoort, the Indian Agent at Green Bay, stated:
“It has been represented to the Secretary of War that the French settlers in the neighborhood of Green Bay have very improperly interfered, to prevent the carrying into effect the arrangements made between the Menominees and Winnebagoes, and the New York Indians (and which have been sanctioned by the government) for a portion of the territory of the former for the latter to settle on; and that they have also endeavored to excite the Indians in that vicinity, to hostility against the New York Indians, with a view of deterring them from settling on these lands which they have acquired under those arrangements. * * * * *
“It is very important to preserve peace between the Indians at Green Bay and the New York Indians who may join them, the arrangement between them to this effect having been made with the sanction of the government, gives them a peculiar claim to protection against the acts of designing and intermeddling white men.” [Emphasis supplied and spelling corrected in the original.] (5 Ind. Cl. Comm. 560, 583)

 As one example of the Government’s consistent Interpretation of the Trade and Intercourse Act, consider the following opinion of the Commissioner of Indian Affairs, T. Hartley Crawford, submitted to the President in 1844 in connection with an agreement between the Wyandot and Delaware Nations for the purchase of land in Kansas which specified that the approval of the President was necessary :
“It is presumed, that the object of the law was to prevent purchases by white persons or communities, because the reversionary interest of the united States could be affected by such acquisitions only — not by the title they would have, but the difficulty and embarrassment of asserting an opposite one. In the case of a purchase by an Indian tribe from another, the objection, that is, *284 the reason of the law, does not hold. Each can claim to be the owners only so long as they lire on the land, and the pui-ebase working not even an apparent change In the quality of the tenure.
“In cases where the united States had no interest in the land, but merely looted on to see, as the guardian of the Indians, that justice was done them, the approbation of the President has been thought sufficient, without the advice and consent of the Senate thereto.” (Report of the Commissioner of Indian Affairs, November 25, 1844, Appendix, Document No. 10. Petitioners' Exhibit No. 140 in Ind. Cl. Comm. Docket No, 75)

 Decisional law on the point is scanty. The Supreme Court, in applying the 1834 Act (4 Stat. 730) to the Pueblo Indians of New Mexico noted that the purpose of restrictions on alienation was to protect the Indians, “a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races.” United States v. Candelaria, 271 U.S. 432, 442 (1926). Accord, Alonzo v. United States. 249 F. 2d 189, 196 (10th Cir. 1957).